## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

AMERICAN PETROLEUM INSTITUTE,
1220 L Street, N.W.
Washington, D.C. 20005

and

CHAMBER OF COMMERCE OF THE
UNITED STATES OF AMERICA,
1615 H Street, N.W.
Washington, D.C. 20062

and

INDEPENDENT PETROLEUM
ASSOCIATION OF AMERICA,
1201 15th Street N.W.
Suite 300
Washington, D.C. 20005

and

NATIONAL FOREIGN TRADE COUNCIL,
1625 K Street, N.W.
Suite 200
Washington, D.C. 20006

        Plaintiffs,

   v.

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION,
100 F Street, N.E.
Washington, D.C. 20549

        Defendant.

Civil Action No.   12-1668

---

## COMPLAINT

Plaintiffs AMERICAN PETROLEUM INSTITUTE, CHAMBER OF COMMERCE OF

THE UNITED STATES OF AMERICA, INDEPENDENT PETROLEUM ASSOCIATION OF

AMERICA, and NATIONAL FOREIGN TRADE COUNCIL, for their Complaint against

Defendant UNITED STATES SECURITIES AND EXCHANGE COMMISSION allege, by and

through their attorneys, on knowledge as to Plaintiffs, and on information and belief as to all

other matters, as follows:

## I.  INTRODUCTION

1.      This is a lawsuit under the First Amendment to the United States Constitution,

and under the Administrative Procedure Act, 5 U.S.C. § 500 *et seq.* ("APA"), challenging a rule

recently promulgated by the U.S. Securities and Exchange Commission ("SEC" or

"Commission"), and the statutory provision authorizing that rule.

2.      By a 2-1 vote (with two recusals), the Commission approved a rule requiring

public companies to disclose certain payments of more than $100,000 when made to foreign

governments for "projects" relating to the commercial development of oil, natural gas, or

minerals.  *See* Disclosure of Payments by Resource Extraction Issuers, 77 Fed. Reg. 56,365

(Sept. 12, 2012) ("Extractive Industries Rule" or "Rule").  Disclosures must also be made

regarding payments to the federal government.

3.      By the Commission's own reckoning, the Rule will cost U.S. public companies at

least $1 billion in initial compliance costs and $200 to $400 million in ongoing compliance costs,

and "could add billions of dollars of [additional] costs" through the loss of trade secrets and

business opportunities.  *See* 77 Fed. Reg. at 56,398, 56,412.  The rulemaking record shows that

the costs will actually be far greater, as U.S. oil and mining companies are forced to allow

competitors access to sensitive commercial information, and to abandon projects to foreign state-

owned companies in countries that forbid the disclosures or that simply refuse to do business

with U.S. companies because they do not wish the disclosures to be made.  Indeed, while the

Commission did not quantify how many "billions of dollars" more its Rule might cost U.S.

businesses, it acknowledged that American companies may be forced to "sell their assets in the . . . host countries at fire sale prices," or else keep existing assets idle and "not use them in other projects." *Id.* at 56,412.  The net result would be to compel U.S. oil, gas, and mining companies to engage in speech—in violation of their First Amendment rights—that would have disastrous effects on the companies, their employees, and their shareholders.

4.  The Commission's principal defense of this onerous rule is to claim that it was required by law to issue the rule it adopted, under Section 1504 of the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank"), Pub. L. No. 111-203, § 1504, 124 Stat. 1376, 2220 (2010) (codified at 15 U.S.C. § 78m(q)).  That claim is mistaken.  Section 1504 provides that the Commission "shall issue final rules that require each resource extraction issuer to include in an annual report . . .  information relating to any payment made by the resource extraction issuer . . . to a foreign government . . .  for each project . . . relating to the commercial development of oil, natural gas, or minerals." *Id.* § 78m(q)(2)(A).  Congress further provided that the Commission "shall make available online, to the public, a *compilation* of the information required to be submitted under the rules issued under paragraph (2)(A)." *Id.* § 78m(q)(3)(A) (emphasis added).

5.  Thus, Section 1504 requires only that a "compilation" or aggregation of payment information made by all U.S. companies to each foreign government and the federal government be made publicly available.  The Commission, however, grossly misinterpreted its statutory mandate to require that each U.S. company publicly file a report on the Commission's online electronic database (EDGAR) detailing each payment made to each and every foreign government, for each and every "project" relating to extractive industries.  And the Commission adopted this approach despite the fact that publication of a "compilation" would have served the

purposes of the statute without further burdening U.S. companies or revealing trade secrets or pricing strategies to competitors.

6.      This misreading of the statute by the Commission exacerbated the infringement of First Amendment interests caused by the statute itself.  Section 1504 forces U.S. public companies to engage in speech that they do not wish to make, in violation of their contractual and legal commitments.  The Commission has said that the purpose of this compelled speech is to give people of other nations information regarding their governments' revenues, so they may monitor the degree to which those revenues are expended for the public welfare and so that— through political action—they may change their governments' fiscal policies and practices.  This compelled speech is not instrumental or essential to any government regulatory or enforcement program and does not further the investor protection purposes of the securities laws.  On the contrary, the Commission has concluded that it will cost U.S. companies billions of dollars, and will advantage the owners of non-U.S. companies.  In its final rule, the Commission only compounded the statute's infringement of constitutional rights by requiring U.S. companies to individually and publicly disclose the amounts and recipients of their payments.

7.      In deciding to require this public, company-specific reporting, and at other key junctures in the rulemaking process, the Commission thoroughly failed to properly consider the costs and benefits associated with the Rule.  Section 23(a)(2) of the Exchange Act prohibits the Commission from adopting "any . . . rule . . . which would impose a burden on competition not necessary or appropriate in furtherance of" the Act, and Section 3(f) requires the Commission "to consider or determine whether an action is necessary or appropriate in the public interest," and "whether the action will promote efficiency, competition, and capital formation."  77 Fed. Reg. at 56,373 & n.88, 56,397.

8.      Yet, the Commission failed to properly consider the Rule's effects on competition, or whether the Rule was likely to achieve its desired benefits in light of its enormous costs.  Indeed, the best the Commission could muster as to the Rule's purported benefits was that it "*may* result in social benefits" that "cannot be readily quantified with any precision."  77 Fed. Reg. at 56, 398 (emphasis added).  As Commissioner Gallagher wrote in dissent, "we have no reason to think the SEC will succeed in achieving complex social and foreign policy objectives as to which the policymaking entities that *do* have relevant expertise have, to date, largely failed."  Statement of Commissioner Gallagher (Aug. 22, 2012), *available at* http://www.sec.gov/news/speech/2012/spch082212dmg-extraction.htm#P28_6923.

9.      While the Commission paid lip service to the requirement for cost-benefit analysis and tabulated (erroneously) some of the direct costs of the Rule, it repeatedly failed to resolve critical questions that directly relate to the Rule's effect on competition; made regulatory choices that exacerbated the competitive harm to U.S. companies and increased the burden on First Amendment rights; and flatly refused to allow any exemption from the Rule's requirements to protect U.S. companies from the billions of dollars in competitive harm it projected.

10.      The Commission has statutory authority to provide exemptions from the requirements of its rules and from the Exchange Act when doing so is "necessary or appropriate" and consistent with the public interest (15 U.S.C. § 78l(h))—an authority the Commission has exercised under the Exchange Act and other securities laws scores of times in its history.  In the final Rule, the Commission arbitrarily rejected any exemption from the Rule's disclosure requirements for projects in countries that forbid such disclosures by law.  77 Fed. Reg. at 56,368.  That refusal flies in the face of principles of comity and the Restatement (Third) of

Foreign Relations Law, both of which counsel against implementing a statute in a manner that causes a direct conflict with foreign law.

11.     Although such an exemption would have protected investors by preventing billions of dollars in lost business opportunities and compliance costs, the Commission reasoned, in circular fashion, that any exemption from the supposed requirements of Section 1504 would not further the purpose of the statutory provision—which would be true of *any* exemption from a statutory requirement, and which again ignores the Commission's independent obligation to consider the effect of its actions on competition, efficiency, and capital formation.

12.     The Commission abdicated its statutory duties in other respects as well, including by refusing to define the critical statutory term "project," despite commenters' insistence that a clear definition was needed and that if "project" was defined as a particular geologic basin or province, it would substantially reduce the costs and competitive injury resulting from the multi-billion dollar Rule.  Defining "project" by reference to a specific geographic location would have removed needless uncertainty about whether businesses needed to disclose granular (and unnecessary) information about every extractive operation, under every contract, at each particular site where oil or minerals are found.  The Commission also refused the public an opportunity to comment upon its final economic analysis, which introduced information and methodologies that were not in the rulemaking record or the proposing release.  Had the Rule been re-proposed, commenters would have shown that the Commission relied upon documents and suppositions outside the administrative record, and still vastly underestimated the total costs of this Rule.

13.     As Commissioner Gallagher stated in his dissent from the Rule, the Commission ultimately failed to determine the benefits of the Rule and disregarded the "significant costs [to]

issuers—and thereby shareholders."  Statement of Commissioner Gallagher, *available at* http://www.sec.gov/news/speech/2012/spch082212dmg-extraction.htm#P28_6923.  The Commission, he said, "rejected[] a plain language reading of section 1504 that would minimize the competitive risk and lower the costs of our rule, but that would fulfill in all respects the legislative intent manifest in the provision's plain language.  The cost-benefit analysis . . . did not seriously consider that."

14.     In all these ways and more, the Commission acted arbitrarily and capriciously, and violated the Administrative Procedure Act, the Exchange Act, and the prohibition on compelled speech embodied in the First Amendment to the U.S. Constitution.  Plaintiffs seek a declaration that Section 1504 and the Extractive Industries Rule violate the First Amendment and are null, void, and without force and effect; vacatur of the Extractive Industries Rule; and other necessary and appropriate relief, as explained in further detail in the Prayer for Relief below.

## II.  PARTIES

15.     Plaintiff American Petroleum Institute ("API") is a national trade organization representing over 500 companies involved in all aspects of the domestic and international oil and natural gas industry, including exploration, production, refining, marketing, distribution, and marine activities.  Its members include many of the leading public companies in the oil, natural gas, and mining industries.

16.     Plaintiff Chamber of Commerce of the United States of America ("the Chamber") is the world's largest business federation.  The Chamber represents 300,000 direct members and indirectly represents an underlying membership of more than three million businesses and organizations.  Its members include many of the leading public companies in the oil, natural gas, and mining industries.  An important function of the Chamber is to represent the interests of its

members in matters before Congress, the Executive Branch, and the courts.  To that end, the

Chamber regularly participates in cases that raise issues of vital concern to America's business

community.

17.     Plaintiff Independent Petroleum Association of America ("IPAA") is a national

trade association headquartered in Washington, D.C.  It represents thousands of independent oil

and natural gas producers and service companies across the United States, including many public

extractive industry companies that are directly affected by the Commission's Rule.

18.     Plaintiff National Foreign Trade Council ("NFTC") is a trade association that was

founded in 1914 by a group of American companies and now serves more than 300 member

companies through offices in Washington, D.C. and New York.  Its members include some of

the leading public companies in the oil, natural gas, and mining industries.

19.     Defendant SEC is (and was at all relevant times) an agency of the U.S.

government subject to the Administrative Procedure Act.  *See* 5 U.S.C. § 551(1).  It was created

in 1934 by the Securities Exchange Act.  *See* Section 4, 15 U.S.C. § 78d.

## III.  JURISDICTION AND VENUE

20.     This action arises under the Administrative Procedure Act, 5 U.S.C. §§ 500, *et

seq.*, the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a *et seq*., and the U.S. Constitution,

U.S. Const., Amend. I.  Jurisdiction therefore lies in this Court under 28 U.S.C. § 1331; *see also*

5 U.S.C. § 704.

21.     Each Plaintiff has standing to bring this suit on behalf of its members because at

least one of its members would have standing to sue in its own right, the interests it seeks to

protect are germane to its purpose, and neither the claim asserted nor the relief requested requires

an individual member to participate in this suit.  *See Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 507 (D.C. Cir. 2010).

22.     Venue is proper in this Court under 28 U.S.C. § 1391(e) because this is an action against an agency of the United States that resides in this judicial district and a substantial part of the events or omissions giving rise to this action occurred in this judicial district.

## IV.  BACKGROUND

### A.     Extractive Industries

23.     The extractive industry sector comprises oil, natural gas, and mining companies. The industry is highly competitive and is essential to the economic health and national security of the United States, which depends on ready access to reliable and affordable energy and mineral resources.  *See* API Comment Letter at 1 (Jan. 28, 2011).  Indeed, the oil and natural gas industry provides nearly two-thirds of the primary energy consumed in the United States, including more than 95% of all transportation fuel consumed.  *See* Chamber of Commerce, Institute for 21st Century Energy Comment Letter at 3 (Mar. 2, 2011).  Extractive industries support millions of U.S. jobs, and millions more Americans invest in these companies through retirement and pension plans, mutual funds, and individual investments.  *See* API Comment Letter at 1 (Jan. 28, 2012).

24.     The Rule covers more than 1,000 public companies.  *See* API Comment Letter at 1 (Jan. 28, 2011); *see also* 77 Fed. Reg. at 56,408.  Many of these companies invest billions of dollars in foreign countries in myriad activities related to locating and extracting natural resources, "ranging from obtaining rights to explore, to the acquisition of seismic data, to the negotiation of agreements, to exploratory drilling, to development and production plans."  API Comment Letter at 1 (Dec. 9, 2010).  For example, Royal Dutch Shell has investments worth

over $20 billion in Qatar and China alone.  *See* Royal Dutch Shell Comment Letter at 1 (Aug. 1, 2011).

25.     Despite the number and size of the companies subject to the Rule, they ultimately "represent a small percentage of the global energy market and are not afforded the market power to compel host countries to enter into agreements that are subject to disclosure and against their national interest."  Chamber of Commerce, Institute for 21st Century Energy Comment Letter at 3 (Mar. 2, 2011).  Rather, "[o]ver 90% of the world's oil reserves are owned or controlled by National Oil Companies (NOCs)," most of which are not subject to the Commission's jurisdiction and will not be required to comply with Section 1504.  *Id*.

**B.      Section 13(q) of the Securities Exchange Act**

26.     Section 1504 of the Dodd-Frank Act amended the Securities Exchange Act of 1934 to require that the Commission promulgate rules requiring "resource extraction issuer[s]" to disclose in an annual report to the Commission certain payments (that are non-de minimis) made to the United States or a foreign government in connection with any "projects" related to "the commercial development of oil, natural gas, or minerals."  15 U.S.C. § 78m(q) (Section 13(q)).

27.     In enacting Section 1504, Congress made clear that it intended the Commission's rules to track, to the extent possible, the standards of the Extractive Industries Transparency Initiative ("EITI").  *See* 15 U.S.C. § 78m(q)(1)(C)(ii) (referring to EITI); *id*. § 78m(q)(2)(E) (Commission's rules should "support . . . international transparency promotion efforts").

28.     EITI is a voluntary initiative launched by Tony Blair in 2002 that is presently supported by extractive industry companies, governments, investors, and civic organizations. *See* EITI Sourcebook at 4-5 (2005).  The primary objective of EITI is to provide transparency to government leaders and citizens in resource-rich countries regarding payments made by

companies in the extractive industries to those countries' governments.  *See* API Comment Letter at 3 (Oct. 12, 2010).  As part of this process, when a country establishes a reporting regime under EITI, the country's government works cooperatively with civil society groups and with the oil, natural gas, and mining industries to establish a protocol for the reporting of payments.  EITI Sourcebook at 34.  EITI thus permits the parties to extractive industry contracts to determine the appropriate level of disclosure, including whether or not to publish company-specific payment information.

29.     Consistent with the EITI, Section 1504 contains no requirement that company-specific information be publicly disclosed.  On the contrary, a subsection titled "Public availability of information" provides that "*[t]o the extent practicable*, the Commission shall make available online, to the public, a *compilation* of the information required to be submitted under the rules issued under paragraph (2)(A)."  15 U.S.C. § 78m(q)(3) (emphases added).

30.     Section 1504 was codified as part of Section 78m of the Exchange Act, a section as to which the Commission has express, longstanding statutory authority to grant exemptions when the Commission deems it "necessary or appropriate" and "finds . . . that such action is not inconsistent with the public interest or the protection of investors."  15 U.S.C. § 78l(h).  In considering whether a particular exemption is "in the public interest," the Commission is required to consider "whether the action will promote efficiency, competition, and capital formation."  15 U.S.C. § 78c(f).  A separate provision of the Act, Section 23(a)(2), prohibits the Commission from adopting a "rule or regulation which would impose a burden on competition not necessary or appropriate in furtherance of the purposes of this title."  15 U.S.C. § 78w(a)(2).

31.     The Commission has exercised its exemptive authority under Section 78l(h) and similar provisions scores of times in its history to relieve public companies from responsibilities

otherwise required by statute, including from disclosure obligations that could conflict with foreign law.  For example, in 1935, one year after the Exchange Act was enacted, the Commission promulgated Rule 3a12-3, which exempts foreign private issuers from certain disclosure requirements under the Act.  Similarly, the Commission previously granted an exemption to public companies required to disclose proved oil reserves, where such disclosures would violate local law.  *See* Regulation S-K Item 1202, Instruction 4 to Paragraph (a)(2) (17 C.F.R. § 229.1202).  The 1202 exception applies to virtually the same group of companies and the same foreign laws that prohibit disclosure of payment information.

32.     The Commission's use of its exemptive authority in the past to avoid conflicts with foreign law is consistent with the longstanding principle of law and comity that acts of Congress should be construed to avoid conflicts with the laws of other nations.  This use of the exemptive authority has also given effect to the Restatement (Third) of Foreign Relations Law, which provides that states must not require a person to do an act in another state that is prohibited by the law of that state.

33.     In the past, the Commission has successfully championed its authority to provide exemptions from statutory requirements, even when doing so would "render[] protections that would otherwise be in force inapplicable with respect to a particular class of securities or issuers."  *Schiller v. Tower Semiconductor, Ltd.*, 449 F.3d 286, 296 (2d Cir. 2006).  As a matter of law, Congress is presumed to have been aware of this authority when Section 1504 was enacted as an amendment to Section 78m of the Exchange Act.

**C.      The Commission's Proposed Rule**

34.     On December 15, 2010, the Commission issued its proposed extractive industries rule.  That rule proposal effectively ignored the enormous costs of the rule under consideration—

the only estimate it provided related to the time it would take a public company to prepare the required annual report.  The Commission projected these costs as $11,857,200 annually (an average of about $10,000 per company) for outside professional services.  *See* Disclosure of Payments by Resource Extraction Issuers, 75 Fed. Reg. 80,978, 80,994 (Dec. 23, 2010).

35.     Though the Commission acknowledged that there might be additional "costs related to tracking and collecting information about different types of payments across projects," it made no attempt to quantify those costs and concluded that in any event they were "a result of the statutory requirements that [the Commission was] required to implement."  75 Fed. Reg. at 80,996-97.

36.     The Commission's two-page discussion of the proposed rule's effects on efficiency, competition, and capital formation was similarly sparse.  It consisted almost entirely of the Commission's acknowledgment of one commenter's concern that if the final rule required disclosure in cases where the host country forbid it, the rule would "harm the competitive position of issuers and be contrary to the interests of their investors."  75 Fed. Reg. at 80,997. Again, the Commission made no attempt to quantify or analyze these anticompetitive effects. *See id.*  No mention at all was made of the crushing competitive losses U.S. public companies would suffer under the Rule.

37.     The Commission did, however, actively solicit comment on whether the Commission should exempt certain categories of public companies from the final rule.  *See* 75 Fed. Reg. at 80,980.  Indeed, this was the first question posed in the Commission's proposed rule release.  *See id.*

**D.      The Public Comments**

38.      During the public comment period, numerous industry representatives documented the onerous costs of the proposed rule, and the need for targeted exemptions to alleviate those costs.

39.      Commenters estimated that initial and ongoing compliance costs alone could reach tens of millions or even hundreds of millions of dollars.  *See, e.g.*, API Comment Letter at 44 (Jan. 28, 2011) ("Total industry costs just for the initial implementation could amount to hundreds of millions of dollars even assuming a favorable final decision on audit requirements and reasonable application of accepted materiality concepts.").

40.      Commenters also noted that several host countries, including Angola, Cameroon, China, and Qatar, prohibit public disclosures such as those required by the final Rule.  For example, China prohibits public disclosure of confidential business information in Chinese commercial contracts.  *See* Royal Dutch Shell Comment Letter at Appendix C (May 17, 2011) (explaining that Chinese law prohibits disclosure of business secrets and Shell's contracts with the Chinese government require that business secrets be kept confidential).  Likewise, Cameroon prohibits disclosure of all documents, reports, surveys, plans, data, and other information in petroleum contracts, without government authorization.  *See id.* at 2 & Appendix A (explaining that "data" and "other information" could be construed to cover financial information associated with the performance of petroleum contracts); *see also* Exxon Mobil Comment Letter at 1-2 (Mar. 15, 2011) (discussing Qatar, Angola, and China prohibitions).  Commenters added that many foreign governments would simply refuse to do business with companies that would disclose the terms of their contractual agreements.  *See, e.g.*, Chamber of Commerce, Institute for 21st Century Energy Comment Letter at 3 (Mar. 2, 2011).

41.    Royal Dutch Shell estimated that its costs due to lost business with these governments could exceed $20 billion.  Royal Dutch Shell Comment Letter at 1 (Aug. 1, 2011).  API, too, noted the "very real potential for tens of *billions* of dollars of existing, profitable capital investments to be placed at risk."  API Comment Letter at 1 (Aug. 11, 2011).

42.    Commenters also explained that the disclosure requirements would cause competitive injury by providing other market participants with commercially sensitive information, to the benefit of foreign state-owned oil companies that would not be subject to the disclosure regime.  *See* Chamber of Commerce, Institute for 21st Century Energy Comment Letter at 3 (Mar. 2, 2011); 77 Fed. Reg. at 56,371 & n.66 (collecting comments).  As Commissioner Gallagher explained in dissent:

> [L]et's be clear; we're talking about real competition.  Although it would be natural to assume that our large and familiar domestic oil and gas companies fill the list of the world's top ten, that isn't the case.  State-owned oil companies, some of them truly huge even by reference to our largest domestic publicly held oil and gas companies, are major competitors.  I am talking about national oil companies in Russia, China, Iran, and Venezuela among others.  These companies do not operate in the highly transparent, intensely regulated world of U.S. issuers.  And, they will reap competitive advantages through today's rules.

Statement of Commissioner Gallagher, *available at* http://www.sec.gov/news/speech/2012/ spch082212dmg-extraction.htm#P28_6923.

**E.    The Commission's Final Rule**

43.    On August 22, 2012, the Commission issued a final Rule that was deficient in numerous, critical respects.  It failed to account for comments in the record, and wrongly interpreted Section 1504 as requiring companies to publicly disclose payment information relating to each extractive industries project in each foreign country, no matter what the cost.  The Commission failed to apprehend the scope of the discretion it had to minimize the Rule's

burdens, and failed to exercise its discretion in a manner that would have reduced the Rule's

costs on U.S. public companies, their investors and First Amendment rights, and on the U.S.

economy as a whole.

44.     The Commission also failed to discharge its statutory obligation under Section

23(a)(2) of the Exchange Act, which provides that the Commission "shall not adopt any . . . rule

or regulation which would impose a burden on competition not necessary or appropriate in

furtherance of the purposes of this chapter."  15 U.S.C. § 78w(a)(2).  Under Section 23(a)(2), the

Commission was also obligated to consider whether the Rule placed any burdens on competition

"not necessary or appropriate" in light of the purposes of the Exchange Act *as a whole*.  The

Commission arbitrarily failed to consider the economic and competitive effects of the Rule on

public companies and investors, and also failed to tailor the final Rule in light of the paramount

objectives of the securities laws, and the fundamental First Amendment rights at stake.

### *The Commission Improperly Imposed a Public, Company-Specific Disclosure Requirement That Conflicts with the Statutory Text*

45.     The Commission acknowledged that Congress modeled Section 1504 on existing

EITI standards, and that its rule should reflect those standards except where the statutory text

"*clearly deviates* from the EITI."  77 Fed. Reg. at 56,367 (emphasis added).  And yet, the

Commission misread the statutory text and legislative history to require that it deviate from the

EITI practice, which permits host countries to report payment information on an aggregated

basis.  Instead, the Commission requires the filing of company-specific payment information that

is publicly available via EDGAR.

46.     Section 1504 provides that the Commission's final rules shall "require each

resource extraction issuer to include in an annual report" to the Commission the specified

payment information, and then, "[t]o the extent practicable, the Commission shall make available

online, to the public, a compilation of the information required to be submitted under the rules."

15 U.S.C. §§ 78m(q)(2)(A), (3)(A).  As API explained in a comment letter, "the statute does not

require that the submitted reports themselves be publicly available."  API Comment Letter at 39

(Jan. 28, 2011).  Rather, API explained, "The reporting obligation is to the SEC, which is then

required to make a 'compilation' available," and only "as practicable."  *Id.*  Thus, Congress

provided the Commission with "the flexibility to aggregate the reported payment information on

a per-country basis, taking into account the practicability provision of the statute."  *Id.*

47.     API further noted that limiting public disclosure to the statutorily-mandated

"compilation" of payment information "would be consistent with current EITI practice, and

would eliminate many of the competitive harms that issuers face under the current proposal (with

public disclosure on a disaggregated basis)."  API Comment Letter at 40 (Jan. 28, 2011).

Specifically, Plaintiffs warned that the Rule would require disclosing commercially sensitive

contract terms to competitors; force companies to choose between ceasing to list on a U.S. stock

exchange or violating foreign law or contracts with foreign countries that contain non-disclosure

provisions; place SEC registrants at a competitive disadvantage relative to non-registrants; and

undermine transparency by encouraging foreign governments to shift business to companies that

are not subject to the reporting requirements (such as state-owned oil and natural gas

companies).  API Comment Letter at 3 (Dec. 9, 2010); Chamber of Commerce, Institute for 21st

Century Energy Comment Letter at 3 (Mar. 2, 2011).   Although fully apprised of these concerns,

the Commission failed to heed them, and adopted a company-specific, project-specific disclosure

requirement.

48.     In explaining its rejection of confidential submission of company-specific

information, the Commission stated that Section 1504's "provisions, when read together and

with the statute's transparency goal, mean that the statutory intent is for the disclosure made by resource extraction issuers to be publicly available." 77 Fed. Reg. at 56,391.  In particular, the Commission reasoned, the requirement that companies submit their annual report in an "interactive data format . . . suggests that Congress intended for the information to be available for public analysis," and that, in any event, confidential submission would not address commenters' concerns because "the information may well be subject to disclosure under the Freedom of Information Act."  *Id.*  The Commission then compounded its error by requiring public companies to file their annual report, rather than merely "furnish" it, subjecting companies to the risk of liability under Section 18 of the Exchange Act or Rule 10b-5 for false or misleading statements.  *See id.* at 56,395 & n.477.

49.     In basing its decision in part on the supposition that FOIA "might" require public disclosure of the information in any event, 77 Fed. Reg. at 56,401, the Commission was obligated not merely to speculate, but to determine as best it could what FOIA *actually* would require.  And in fact, FOIA specifically exempts from disclosure a company's trade secrets and commercial or financial information.  *See* 5 U.S.C. § 552(b)(4) (exempting "trade secrets and commercial or financial information obtained from a person and privileged or confidential").  Indeed, SEC Rule 83 provides a well-established procedure for public companies to seek confidential treatment of submitted information in accordance with FOIA's exemptions.  The Commission's indeterminate invocation of FOIA was therefore arbitrary and capricious.

50.     The Commission similarly erred in concluding that Section 1504's requirement that information be filed in an "interactive data format" implied a congressional intention that the individual company information be made public.  *See* 77 Fed. Reg. at 56,391.  In fact, as the Commission has recognized elsewhere, interactive data formats can help facilitate the

Commission's own review of data—or its preparation of an aggregated compilation.  *See* Final Rule, Interactive Data to Improve Financial Reporting, 74 Fed. Reg. 6,776, 6,793 (Feb. 10, 2009) ("The availability of interactive data . . . may also enhance [the Commission's] review of company filings.").

51.    The Commission took no account whatsoever of the added burden on First Amendment rights associated with requiring companies to disclose their payments publicly, rather than to the Commission alone, so it could then make the data available to the public in an aggregated—anonymous—form.

52.    The Commission's requirement of company-specific public disclosure rests on an erroneous interpretation of the statute, on doubly-flawed reasoning, and exacerbates Section 1504's intrusion on First Amendment rights.  The Rule must be vacated.

### *The Commission Failed to Define "Project"*

53.    The Commission declined to provide a definition in the final Rule of the critical term "project," despite requests from commenters to do so.

54.    Section 1504 provides that the Commission shall require public companies to include in their annual report to the Commission information concerning "the type and total amount of . . . payments made for each *project* of the resource extraction issuer relating to the commercial development of oil, natural gas, or minerals," as well as "the type and total amount of such payments made to each government."  15 U.S.C. § 78m(q)(2)(A) (emphasis added).

55.    API and other commenters proposed that the term "project" in the statute be defined as "technical and commercial activities carried out within a particular geologic basin or province to explore for, develop and produce oil, natural gas or minerals."  API Comment Letter at 2 (Dec. 9, 2010); *see also* Exxon Mobil Comment Letter at 6 (Jan. 31, 2011) (same).  API

explained that it made sense to define "project" with respect to a particular geologic location

because "[t]he existence of a particular resource, with its own unique physical and geologic

characteristics, is the common factor that links a myriad of activities—ranging from obtaining

rights to explore, to the acquisition of seismic data, to the negotiation of agreements, to

exploratory drilling, to development and production plans—to a single common purpose."  API

Comment Letter at 2 (Dec. 9, 2010).  Also, API noted that this definition of "project" could be

consistently applied, and would permit companies to aggregate individual payments under a

single contract or under multiple contracts (as long as they pertained to the same geologic basin),

which would "help reduce the potential harm to companies and their shareholders from the

disclosure of commercially sensitive information, violation of local laws, or breach of contract."

*Id.*; *see also* Royal Dutch Shell Comment Letter at 3-4 (Jan. 28, 2011).  Finally, commenters

explained, this definition of "project" would permit companies to aggregate individual contracts

and extraction operations in particular locations, thereby reducing the costs of the Rule and

ameliorating some of its anticompetitive effects by, for example, avoiding disclosure of

information that could be used by foreign competitors in future bids.

56.     The Commission refused to adopt this definition of "project."  Indeed, it declined

to provide any definition at all—an abdication of responsibility that will cause uncertainty

among companies subject to the Rule and thereby increase implementation costs.  In doing so,

moreover, the Commission relied upon arbitrary, inconsistent rationales for its actions.

57.     The Commission stated at one point that "project" is a commonly used term

whose meaning "is *generally understood* by resource extraction issuers and investors."  77 Fed.

Reg. at 56,406 (emphasis added).  If that is the case, then the Commission should have

articulated that "generally understood" meaning to provide clarity and consistency in application.

Indeed, the Commission's suggestion that greater clarity and fewer costs would result from its *refusal* to define a statutory term is wholly inconsistent with its claim in another context that defining statutory terms provides *greater* "clarity" to regulated businesses, thereby increasing efficiency, competition, and capital formation. *See Am. Equity Inv. Life Ins. Co. v. SEC*, 613 F.3d 166, 177-78 (D.C. Cir. 2010).

58.    Elsewhere in the release, the Commission said that there "does not appear to be a single agreed-upon application [of the term] in the industry," and attempted to excuse its failure to define "project" on that ground. 77 Fed. Reg. at 56,385. That rationale, which is diametrically opposed to the one given pages later in the release, is arbitrary, capricious, and an improper basis for abdicating an agency's responsibility to resolve difficult questions and to provide clear direction to regulated entities being subjected to a multi-billion dollar rule.

59.    The Commission's reasons for refusing to define project as a "basin" or "district" in particular were similarly arbitrary and inconsistent. It reasoned that basins or districts may span more than one country, but did not explain why that should matter when defining the term "project," beyond observing that it "would be counter to the country-by-country reporting required by Section 13(q)." 77 Fed. Reg. at 56,406. In fact, that is wrong, because the statute requires reporting by project *and* country: All payments on a project could be reported on a country-by-country basis. The Commission also noted that the definition "may" not reflect public companies' contractual relationships with foreign governments—a Delphic statement whose meaning, and relevance, the Commission failed to explain. *Id.*

60.    In failing to define "project" as API and others advocated, the Commission abdicated its responsibility to promulgate a rule that burdened competition no more than "necessary or appropriate." *See* Exchange Act, Section 23(a)(2), 15 U.S.C. § 78w(a)(2).

Congress gave the Commission the flexibility to significantly reduce the costs and harmful effects of the Extractive Industries Rule, but the Commission washed its hands of that discretionary authority, opting instead for increased uncertainty and crushing costs.  For this reason, too, the Rule must be vacated.

### The Commission Failed to Grant Any Exemption from the Rule for Foreign Laws that Prohibit Disclosure

61.     The Commission refused to provide an exemption to public companies in cases where disclosure is prohibited by foreign law, despite the costs and competitive disadvantages associated with denying such an exemption, and despite having solicited comments (in its very first question in the proposed rule) on whether it should exempt certain categories of public companies.  *See* 75 Fed. Reg. at 80,980.

62.     The Exchange Act provides the Commission with broad discretion to grant exemptions to public companies if an exemption is consistent with the public interest and the protection of investors.  *See, e.g.*, 15 U.S.C. §§ 78mm, 78l(h).  In considering whether an exemption is in the public interest, the Commission must account for effects on efficiency, competition, and capital formation.  *See* 15 U.S.C. § 78c(f).  The competitive benefits of an exemption in this case would have been vast:  U.S. companies would be spared the possibility of losing billions of dollars in business to foreign and state-owned oil companies or having to sell dramatically devalued assets in foreign countries at "fire sale" prices.  77 Fed. Reg. at 56,412.

63.     In refusing to allow any exemption from the Rule, the Commission explained that an exemption would detract from the transparency objectives of the statute.  *See* 77 Fed. Reg. at 56,372.  The Commission ignored, however, that *every* exemption to some extent reduces the efficacy of the statutory provision at issue; that is in the nature of an exemption.  Indeed, the Commission's position is inconsistent with its prior acknowledgments that the Commission and

"Congress have long understood [that], in order to obtain certain protection for investors[,] it is sometimes necessary and appropriate to forego others through exemptive relief." *Schiller v. Tower Semiconductor, Ltd.*, No. 04-5295, SEC Letter Brief 10 (Jan. 10, 2006); *see also id.* ("an exemption can be consistent with the protection of investors even when it deprives those investors of certain statutory or regulatory protections that would apply in the absence of the exemption.").

64.     The Commission's refusal to grant an exemption is also inconsistent with the agency's practice with regard to foreign law in particular.  In the past, the Commission repeatedly has granted exemptions when public disclosure could conflict with foreign laws. Those exemptions include the 1935 exemption for foreign private issuers (Rule 3a12-3), and the more recent exemption for companies required to disclose proven reserves in countries where disclosure is prohibited.  *See* Regulation S-K Item 1202, Instruction 4 to Paragraph(a)(2). Because Congress presumes that its statutes will be construed to avoid conflicts with foreign law, under the Restatement (Third) of Foreign Relations Law and principles of comity, and because avoiding such conflicts would reduce the costs of the Rule on public companies, the Commission was obligated to provide U.S. companies a limited exemption to Section 13(q).

65.     In failing to grant the exemption, the Commission also failed to comply with its statutory duty under Section 23(a)(2) of the Exchange Act to issue a rule that burdens competition no more than "necessary or appropriate," and again deployed reasoning that it contradicted elsewhere in the Rule release.  An exemption, it speculated at one point, "could undermine the statute by encouraging countries to adopt laws, or interpret existing laws, specifically prohibiting the disclosure required under the final rules."  77 Fed. Reg. at 56,372-73. Elsewhere in the release, however, when attempting to minimize the Rule's adverse competitive

effects, the Commission suggested the opposite, speculating that increasing global support for

EITI will pressure countries to *adopt* disclosure obligations.  *See id.* at 56,413.

***The Commission's Cost-Benefit Analysis Was Flawed And Deprived Commenters of Proper
Notice of the Commission's Methodologies by Failing to Disclose Them Before the Final Rule***

66.     The Commission introduced an entirely new cost-benefit analysis in adopting the

final Rule, without providing the public further opportunity to comment.

67.     In the final Rule release, the Commission made no determination whether the

Rule would result in any benefits, nor any determination regarding the amount or extent of any

such benefits.  Rather, the Commission speculated that the Rule "*may* result in social benefits

that cannot be readily quantified with any precision," and further stated that these benefits "do

not appear to be ones that will necessarily generate measurable, direct economic benefits to

investors or issuers."  77 Fed. Reg. at 56,398 (emphasis added).  With respect to costs, however,

the Commission calculated that the initial and ongoing compliance costs associated with the Rule

would collectively total as much as $1.4 billion.  *See id.*

68.     The Commission reached this cost estimate by extrapolating industry-wide

numbers from cost estimates provided by only four commenters, using formulae that the

Commission did not previously rely upon or disclose in the proposed rule release.  Using these

formulae, the SEC estimated that the total initial cost of compliance for all public companies is

"approximately $1 billion and the ongoing cost of compliance is between $200 million and $400

million."  77 Fed. Reg. at 56,398.

69.     The Commission did not share its methodologies with commenters prior to the

final Rule release.  Moreover, as the Commission conceded, its methodologies had "limitations"

that almost certainly underestimated the true costs of the Rule.  77 Fed. Reg. at 56,410.  Indeed,

these "limitations" were fatal flaws.  For example, the Commission relied exclusively on data

24

provided by two large issuers (Barrick Gold and Exxon Mobil) to derive industry-wide estimates for initial compliance costs. The Commission calculated the ratio of these companies' costs to their total assets, and then assumed that all companies would incur costs at the same variable rate as these two large entities. *See id.* Besides relying on an unrepresentative sample of two companies for a group that totals over 1,000, the Commission's analysis discounted the real possibility that smaller companies will incur costs representing a higher percentage of total assets than their larger counterparts. *See id.*

70. With respect to indirect costs, the Commission grossly underestimated the adverse economic effects of the Rule. The Commission acknowledged that at least 51 public companies did business in the four host countries identified by commenters as prohibiting such disclosure (Angola, Cameroon, China, and Qatar), yet the Commission purported to quantify the costs for only three of those companies, estimating that the combined lost cash flow for the three companies would be approximately $12.5 billion. *See* 77 Fed. Reg. at 56,411. The Commission utterly failed, however, to venture an estimate on the industry-wide impact of the Rule's effect on companies currently doing business or seeking to do business in foreign countries that prohibit disclosure. That number is considerably higher than $12.5 billion: as noted, at least 51 companies do business in one or more of these four countries, and Royal Dutch Shell alone has more than $20 billion in investments in Qatar and China. *See* Royal Dutch Shell Comment Letter at 1 (Aug. 1, 2011).

71. In calculating the competitive costs associated with the potential for lost business in countries that prohibit the required disclosures, the Commission did not even bother to determine how many countries had laws on the books prohibiting disclosure. Rather, it merely

stated that commenters' concerns regarding lost business "appear warranted," and that host country laws "could add billions of dollars of costs to affected issuers."  77 Fed. Reg. at 56,412.

72.      The Commission acknowledged that "losses could be larger" than its multi-billion dollar estimate if "firms are forced to sell their assets" in Angola, Cameroon, Qatar, and China at "fire sale" prices.  77 Fed. Reg. at 56,412.  The Commission also admitted that it "[did] not have data on fire sale prices for the industries of the affected issuers," so—without seeking additional information or providing opportunity for comment—it relied upon a study of prices in the airline industry, finding a 10 to 20 percent decrease in sale prices.  *Id.*  The Commission did not explain why the distressed sale price for airplanes—mobile assets, by definition—would be comparable to the distressed sale price of multi-million dollar fixed assets in the oil industry.

73.      Similarly, the Commission absurdly suggested that the losses from being forced to exit a country could be minimized by re-deploying assets in another location, a hypothesis that conflicts with the elementary facts of extractive industries:  In extractive industries, the value lies in the right to access the resource, and above-ground development assets will often have little value if severed from the natural resources to which they relate.

74.      Plaintiffs and other commenters were prejudiced by the Commission's failure to provide notice of its new cost-benefit methodologies and the analyses upon which it intended to rely in extrapolating costs of the Rule.

**Commissioner Gallagher's Dissent**

75.      Commissioner Gallagher dissented from adoption of the Rule, criticizing the Commission for failing to adequately tailor the Rule to avoid significant adverse effects on competition and capital formation.  "[W]e are *not* at liberty," he explained, "to ignore selectively the longstanding congressional mandate to consider the impact our rulemaking is likely to have

on competition."  Statement of Commissioner Gallagher, *available at*

http://www.sec.gov/news/speech/2012/spch082212dmg-extraction.htm#P28_6923 (citing

Section 23(a)(2) of the Exchange Act).  He continued:

> We are *not* entitled merely to *assume* that the rules we adopt will 'promote
> efficiency, competition, and capital formation.'  Nor, for some rulemaking efforts,
> are we free to assume, first, the benefits themselves, then that they outweigh any
> costs entailed by the actions we may take.  There is no legal basis for doing that.
> Congress has never said we should.  The courts have been emphatic that we
> should *not*.

*Id.*

76.     In particular, Commissioner Gallagher faulted the Commission for requiring

disclosure even where it would "risk violating host country law," and potentially "offend local

sensibilities to such a degree as to put . . . employees and operations at risk, or . . . cause

companies to pull out of certain countries altogether."  Statement of Commissioner Gallagher,

available at http://www.sec.gov/news/speech/2012/spch082212dmg-extraction.htm#P28_6923.

The Commission, he concluded, "did not need to do that."  *Id.*; *see also* Statement of

Commissioner Paredes at Open Meeting to Adopt a Final Rule Regarding Conflict Minerals

Pursuant to Section 1502 of the Dodd-Frank Act (Aug. 22, 2012), *available at*

http://www.sec.gov/news/speech/2012/spch082212tap-minerals.htm#P22_6540

(noting, in connection with a rule released the same day as the Extractive Industries Rule, that

the Commission's exemptive authority "is a distinct source of discretion that the Commission

can avail itself of to fashion what it believes is the appropriate final rule").

77.     Commissioner Gallagher also observed that the Commission had done an even

worse job assessing benefits than assessing costs, stating:  "[W]e cannot accept, untested, the

benefits Congress seeks as justifying whatever decisions we make or burdens we impose," but

rather "are obligated to evaluate the various ways we could try to achieve any intended benefit."

Statement of Commissioner Gallagher, *available at*

http://www.sec.gov/news/speech/2012/spch082212dmg-extraction.htm#P28_6923.  The Rule, he

said, does not have "any realistic prospect of achieving the desired result," yet "will impose

significant costs on issuers—and thereby shareholders—in the process."  *Id.*

## COUNT ONE

### SECTION 1504 AND THE EXTRACTIVE INDUSTRIES RULE VIOLATE THE FIRST AMENDMENT

78.      The First Amendment to the United States Constitution protects persons' right to

speak, and to refrain from speaking.  This protection, which extends to statements that the

speaker does not wish to make, covers corporations and individuals alike.

79.      Section 1504 of the Dodd-Frank Act and the Commission's Extractive Industries

Rule force U.S. companies to engage in speech that discloses sensitive, confidential information

that the Commission concedes will cause them substantial economic harm.  The disclosure

requirement is content-based and extremely burdensome.

80.      This compelled, non-commercial speech is not necessary or essential to

administering any governmental program.  The foreign-policy objectives espoused by the

Commission make clear that the speech is not for purposes of regulating the securities market or

protecting investors, indeed, it would be farcical to contend that a program found by the

Commission to impose billions of dollars in costs on U.S. companies, with no discernible

compensating benefit for shareholders, furthers the investor protection purposes of the securities

laws.

81.      Section 1504 and the Extractive Industries Rule force speech to be made for

public consumption, not merely to the Commission for internal use.  Indeed, rather than

construing the statute so as to reduce the burden on First Amendment rights, the Commission

compounded the constitutional flaws of Section 1504 by requiring companies to publicly reveal confidential and potentially harmful information on a company-specific and project-specific basis.

82.     The intent of these publication requirements is to influence controversial political matters in other nations and advance the U.S. government's foreign policy objectives, despite the knowledge that U.S. companies wish to avoid the speech because it is controversial with certain foreign governments and/or is barred by contracts with those governments or legal restrictions imposed by those governments.  The practical effect of this requirement is to force private companies to engage in costly, burdensome speech in order to further the policy goals of the U.S. government.

83.     Neither Section 1504 nor the final Rule satisfies the strict scrutiny required by the First Amendment because neither is the least restrictive means of serving a compelling government interest.  Likewise, neither Section 1504 nor the final Rule can satisfy intermediate scrutiny because neither is narrowly tailored to serve a substantial government interest.  In particular, the compelled speech does not relate to any illegal activity, nor is it necessary to dispel or counteract other deceptive speech.  Moreover, the federal agency charged with designing, implementing, and administering the statute concededly is uncertain whether the speech in issue will be effective in achieving any benefit.  Commenters identified numerous more narrowly-tailored means of furthering the statutory purpose, but those less restrictive alternatives were rejected for the arbitrary and capricious reasons set forth above.

84.     Section 1504 and the Extractive Industries Rule violate the First Amendment rights of Plaintiffs' members and should be vacated and declared null and void.

85.     Plaintiffs are therefore entitled to relief under 5 U.S.C. §§ 702, 706(2)(B).

<u>**COUNT TWO**</u>

**ARBITRARY AND CAPRICIOUS AGENCY ACTION IN DECLINING TO ALLOW PUBLIC COMPANIES TO SUBMIT PAYMENT INFORMATION CONFIDENTIALLY TO THE COMMISSION**

86.     Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

87.     Plaintiffs and their members have been, and will continue to be, adversely affected and aggrieved by the Commission's promulgation of the Extractive Industries Rule.

88.     The Commission acted arbitrarily and capriciously under the Administrative Procedure Act by misreading the statute to require public disclosure of a company's reports.

89.     The Commission's interpretation of the statute conflicted with its own announced standard—that any interpretation should be consistent with EITI unless the text of the statute "clearly deviate[d]" from those standards.  77 Fed. Reg. at 56,367.

90.     Confidential submission of data and publication in aggregate form would have saved American businesses and their investors billions of dollars.  The Commission therefore bore a heavy burden under the Exchange Act to justify its adoption of a much costlier alternative when publication of aggregate data would have furthered the purposes of the statute without nearly the same adverse effect on competition.  *See* 15 U.S.C. § 78w(a)(2).  Because the Commission erroneously concluded that its hands were tied, there is nothing approaching a reasoned explanation for the Commission's choice in the final Rule.

91.     The Commission also arbitrarily justified its decision to require public reporting in part on the ground that the reports "might" be available in any event under FOIA.  77 Fed. Reg. at 56,401.  It was the Commission's responsibility to determine—not merely speculate— whether reports would be available under FOIA.  And in fact, the reports would be exempt from disclosure because, as the Commission acknowledged, they contain confidential commercial and

financial information that will cost U.S. companies billions of dollars in competitive injury if made public. *See* 5 U.S.C. § 552(b)(4).

92.     Had the Commission exercised its discretion to require confidential individualized disclosures, the Commission could have mitigated the Rule's constitutional infirmity under the First Amendment.   Likewise, the Rule would have been more narrowly tailored, thereby mitigating the constitutional infirmity of Section 1504.

93.     Plaintiffs are therefore entitled to relief under 5 U.S.C. §§ 702, 706(2)(A), (B), (C).

## COUNT THREE

### ARBITRARY AND CAPRICIOUS AGENCY ACTION IN FAILING TO DEFINE "PROJECT" AS A GEOLOGIC BASIN OR PROVINCE

94.     Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

95.     Plaintiffs and their members have been, and will continue to be, adversely affected and aggrieved by the Commission's promulgation of the Extractive Industries Rule.

96.     The Commission's failure to define "project" is arbitrary and capricious under the Administrative Procedure Act.

97.     It lay within the Commission's discretion to define the statutory term "project" as a geologic basin or province.  This definition would have protected U.S.-listed companies from potentially billions of dollars in compliance costs, by providing certainty in application and by permitting companies to aggregate innumerable individual payments made under various contracts as long as they all related to extraction of a particular resource in a particular geologic area.  This definition—which also would have yielded a more narrowly-tailored rule that impinged less upon First Amendment rights—was arbitrarily rejected by the Commission, which

advanced inconsistent rationales and improperly abdicated its responsibilities when it refused to provide a definition at all.

98.     It was arbitrary and capricious for the Commission to fail to define a critical term in the statute when commenters sought guidance and proposed a workable option.  This failure to provide a definition will vastly increase implementation costs and impose unnecessary and adverse effects on efficiency, competition, and capital formation.

99.     Plaintiffs are therefore entitled to relief under 5 U.S.C. §§ 702, 706(2)(A), (B), (C).

## <u>COUNT FOUR</u>

### ARBITRARY AND CAPRICIOUS AGENCY ACTION IN DENYING EXEMPTION TO PUBLIC COMPANIES IN CASES WHERE FOREIGN LAW PROHIBITS DISCLOSURE

100.     Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

101.     Plaintiffs and their members have been, and will continue to be, adversely affected and aggrieved by the Commission's promulgation of the Extractive Industries Rule.

102.     The Commission has express statutory authority to grant exemptions "upon such terms and conditions and for such period as it deems necessary or appropriate, if the Commission finds . . . that such action is not inconsistent with the public interest or the protection of investors."  15 U.S.C. § 78l(h).

103.     The Commission, which solicited comments on possible exemptions, was bound under the Administrative Procedure Act to provide a reasoned explanation for why particular exemptions were or were not in the public interest.  With respect to the proposed exemption for payments whose disclosure would violate the law of a foreign state, the Commission's circular reasoning that an exemption would not further the transparency goals of the statute was arbitrary and capricious.

104.     The Commission also improperly relied on inconsistent assumptions about the incentives facing foreign countries.  When seeking to minimize the Rule's adverse effects on competition, the Commission mused that public companies' loss of business to competitors would be reduced by the fact that foreign states are under pressure to accept the EITI standards.  Yet, it refused to allow any exemption on the ground, in part, that an exemption would incentivize countries to *adopt* laws that would *prohibit* disclosures.  That reasoning was arbitrary and capricious.

105.     The Commission also misinterpreted the statute when it concluded that an exemption based on conflict with foreign law would be inconsistent with the structure and language of Section 1504.  To the contrary, the statute is silent as to exemptions, and the Restatement (Third) of Foreign Relations Law and principles of comity accordingly required the Commission to interpret the statute to avoid conflict with foreign law.  The Commission's disregard of these canons of construction was arbitrary and capricious, and resulted, yet again, in a greater intrusion on First Amendment-protected rights than would have resulted from a more reasonable and narrowly-tailored rule.

106.     Plaintiffs are therefore entitled to relief under 5 U.S.C. §§ 702, 706(2)(A), (B), (C).

## COUNT FIVE

### ARBITRARY AND CAPRICIOUS AGENCY ACTION IN DISREGARDING EXCHANGE ACT SECTION 23(a)(2), WHICH PROHIBITS THE COMMISSION FROM "IMPOS[ING] A BURDEN ON COMPETITION NOT NECESSARY OR APPROPRIATE IN FURTHERANCE OF THE PURPOSES OF THIS TITLE"

107.   Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

108.   Plaintiffs and their members have been, and will continue to be, adversely affected and aggrieved by the Commission's promulgation of the Extractive Industries Rule.

109.   Section 23(a)(2) provides that the Commission "shall not adopt any such rule or regulation which would impose a burden on competition not necessary or appropriate in furtherance of the purposes of this title."  15 U.S.C. § 78w(a)(2).

110.   The Commission's singular focus on Section 13(q)'s purpose of promoting transparency and the accountability of foreign governments was incomplete in light of the statutory command prohibiting the Commission from enacting rules that place burdens on competition "not necessary or appropriate in furtherance of the purposes *of this title*."  Under Section 23(a)(2), the Commission was required to take into consideration the potential economic effects of the Rule on public companies and investors, consistent with the investor-protection goals of the Exchange Act as a whole.

111.   The Commission acted arbitrarily and capriciously by failing to adequately consider whether its discretionary decisions in the rulemaking—including the decisions to refuse to allow confidential reporting, to define "project," and to grant an exemption for conflicts with foreign law—resulted in burdens on competition that were "necessary or appropriate" to further Congress's goals under the Exchange Act.

112.    The Commission's analysis is also arbitrary and capricious because it simply asserted that its discretionary choices promoted Congressional intent, without providing supporting analysis or evidence.

113.    Plaintiffs are therefore entitled to relief under 5 U.S.C. §§ 702, 706(2)(A), (C).

### COUNT SIX

**ARBITRARY AND CAPRICIOUS AGENCY ACTION
BY INSUFFICIENT EVALUATION OF COSTS AND BENEFITS**

114.    Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

115.    Plaintiffs and their members have been, and will continue to be, adversely affected and aggrieved by the Commission's promulgation of the Extractive Industries Rule.

116.    Section 3(f) of the Exchange Act requires the Commission "to consider or determine whether an action is necessary or appropriate in the public interest," and "whether the action will promote efficiency, competition, and capital formation."  Under the Exchange Act and the Administrative Procedure Act, the Commission was required to set forth substantial evidence evaluating the costs and benefits of the Rule.  It failed to do so.

117.    The Commission's evaluation of the direct costs of the rule was flawed because the Commission extrapolated an industry-wide standard from data provided by two large companies, and likely underestimated the Rule's costs by assuming that smaller companies adapting the rule would incur costs amounting to the same percentage of total assets.

118.    The Commission was also required, but failed, to make a definitive assessment of the indirect competitive costs of the proposed rule.  Instead, the Commission made assumptions about whether particular countries' laws prohibit disclosure, but did not calculate proposed industry-wide competitive costs.  It merely opined that commenters' concerns about the costs of the rule "appear warranted," 77 Fed. Reg. at 56,412, without considering the possibility that, if

the Rule were twice as costly as the Commission estimated, that might finally cause the

Commission to reconsider its refusal to use its exemptive authority or reduce the Rule's burdens

in other ways.

119.     Plaintiffs are therefore entitled to relief under 5 U.S.C. §§ 702, 706(2)(A), (C).


## COUNT SEVEN

### ARBITRARY AND CAPRICIOUS AGENCY ACTION IN FAILING TO SOLICIT ADDITIONAL COMMENTS AFTER RELEASING FLAWED COST-BENEFIT ANALYSIS FOR FIRST TIME IN FINAL RULE

120.     Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

121.     Plaintiffs and their members have been, and will continue to be, adversely

affected and aggrieved by the Commission's promulgation of the Extractive Industries Rule.

122.     In adopting the final Rule, the Commission relied on methodologies for

calculating the costs and benefits that had not been disclosed or submitted for public comment

previously in the rulemaking.  Those methodologies involved attempts at ball-parking industry-

wide costs by pointing to raw data submitted by two companies (in the case of initial compliance

costs) or three companies (in the case of ongoing costs and indirect costs).  These formulae were

flawed and were not made public until the day the Commission released its final Rule, whereas

in fact the Commission was required under the Administrative Procedure Act to provide public

notice and an opportunity for comment on its new methodology and cost assessment.  It was also

arbitrary and capricious for the Commission to rely on extra-record material (i.e., a survey of the

airline industry) to calculate expected costs.

123.     Plaintiffs suffered prejudice because a proper cost-benefit analysis would have

shown that the costs of the Rule are significantly higher than those estimated by the Commission,

making it even more imperative that the Commission make discretionary decisions that would

reduce costs and diminish the adverse effects on competition—including granting appropriate

exemptions and permitting confidential submission of data.

124.    Plaintiffs are therefore entitled to relief under 5 U.S.C. §§ 702, 706(2)(A), (C),

(D).

## PRAYER FOR RELIEF

125.    WHEREFORE, Plaintiffs pray for an order and judgment:

a.    Declaring that Section 1504 violates the U.S. Constitution and is null,

void, and with no force or effect;

b.    Declaring that the Extractive Industries Rule violates the First Amendment

of the U.S. Constitution and is null, void, and with no force or effect;

c.    Declaring that the Extractive Industries Rule was promulgated by the

Commission without statutory authority within the meaning of 5 U.S.C. § 706(2)(C); was

not promulgated in accordance with procedures required by law within the meaning of

5 U.S.C. § 706(2)(D); and is arbitrary and capricious within the meaning of 5 U.S.C.

§ 706(2)(A);

d.    Vacating and setting aside the Extractive Industries Rule in its entirety;

e.    Enjoining the Commission and its officers, employees, and agents from

implementing, applying, or taking any action whatsoever under the Extractive Industries

Rule;

f.    Issuing all process necessary and appropriate to postpone the effective

date of the Extractive Industries Rule in its entirety and to maintain the status quo

pending the conclusion of this case;

g.    Awarding Plaintiffs their reasonable costs, including attorneys' fees,

incurred in bringing this action; and

    h.    Granting such other and further relief as this Court deems just and proper.

Respectfully submitted,

Dated: October 10, 2012

/s/ Eugene Scalia
Eugene Scalia, SBN 447524
   *Counsel of Record*
EScalia@gibsondunn.com
Thomas M. Johnson, Jr., SBN 976185
TJohnson@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Telephone:      202.955.8500
Facsimile:      202.467.0539

*Counsel for Plaintiffs*

*Of Counsel*

Harry M. Ng
Peter C. Tolsdorf
American Petroleum Institute
1220 L Street, N.W.
Washington, D.C. 20005
Telephone:    202.682.8500

*Counsel for Plaintiff American Petroleum Institute*

Robin Conrad
Rachel Brand
National Chamber Litigation Center, Inc.
1615 H Street, N.W.
Washington, D.C. 20062
Telephone:    202.463.5337

*Counsel for Plaintiff Chamber of Commerce of the United States of America*