**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

AMERICAN PETROLEUM INSTITUTE,
*et al.*,

      *Plaintiffs,*

      v.

U.S. SECURITIES AND EXCHANGE
COMMISSION,

      *Defendant,*

and

OXFAM AMERICA, INC.

      *Intervenor-Defendant.*

Civil Action No. 12-cv-1668 (JDB)

---

**OXFAM AMERICA'S OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Intervenor-Defendant

Oxfam America, Inc. ("Oxfam") hereby moves for summary judgment.  For review of agency

action under 5 U.S.C. § 706(2), it is well established that "[t]he scope of review . . . is narrow

and a court is not to substitute its judgment for that of the agency."  *In re Polar Bear Endangered

Species Act Listing and Section 4(d) Rule Litigation*, 709 F.3d 1, 8 (D.C. Cir. 2013); *American

Wildlands v. Kempthorne*, 478 F. Supp. 2d 92, 96 (D.D.C. 2007), *aff'd* 530 F.3d 991 (D.C. Cir.

2008) ("Under the APA's standard of review, there is a presumption of validity of agency

action").  For the reasons fully set forth in the accompanying memorandum and that of the

Securities and Exchange Commission, Oxfam is entitled to judgment as a matter of law.  For the

same reasons, Plaintiffs' motion for summary judgment should be denied.  In support of this

motion, Oxfam hereby submits the accompanying Memorandum of Law, a Supplemental

Appendix, and a letter of supplemental authorities filed in the D.C. Circuit.[1]

                                    Respectfully submitted,

                          */s/ Jonathan Kaufman*
                          Jonathan Kaufman (D.C. Bar. No. 996080)
                          Marco Simons (D.C. Bar No. 492713)
                          EARTHRIGHTS INTERNATIONAL
                          1612 K St. NW Suite 401
                          Washington, DC 20009
                          Phone: 202-466-5188 x103
                          marco@earthrights.org


                          */s/ Howard M. Crystal*
                          Howard M. Crystal (D.C. Bar. No. 446189)
                          Meyer Glitzenstein & Crystal
                          1601 Conn. Ave., N.W. Suite 700
                          Washington, DC 20009-1056
                          hcrystal@meyerglitz.com

                          *Counsel for Oxfam America, Inc.*

Of counsel:

Richard Herz
EARTHRIGHTS INTERNATIONAL
1612 K St. NW Suite 401
Washington, DC 20009
Phone: 202-466-5188

Richard J. Rosensweig
Derek B. Domian
GOULSTON & STORRS, P.C.
400 Atlantic Avenue
Boston, MA 02110-3333
T: (617) 482-1776

---

[1]     Pursuant to the Court's Scheduling Order (DN 23), Oxfam's supporting Memorandum is the brief filed in the D.C. Circuit.  The supplemental letter and Supplemental Appendix ("SA") were also filed in that Court.  *See API v. SEC*, No. 12-1398 (D.C. Cir.), DN 1415569 (Jan. 16, 2013) (SA); *see also id.* DN 1415806 (Jan. 17, 2013) (Order granting motion to file SA); *id.* DN 1430495 (Apr. 12, 2013) (supplemental authorities letter).

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AMERICAN PETROLEUM INSTITUTE, *et al.*, | |
| Plaintiffs, | |
| v. | |
| U.S. SECURITIES AND EXCHANGE COMMISSION, | Civil Action No. 12-cv-1668 (JDB) |
| Defendant, | |
| and | |
| OXFAM AMERICA, INC. | |
| Intervenor-Defendant. | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF OXFAM
AMERICA'S OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
AND CROSS-MOTION FOR SUMMARY JUDGMENT**

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

**A.      Parties and Amici:**  All parties and intervenors are listed in Petitioners'

brief.  In addition, the following have filed notices of intention to appear as *amicus*

*curiae*: Better Markets, Inc.; Senators Benjamin L. Cardin, Richard G. Lugar, and

Carl Levin; and U.S. Representative Edward J. Markey.

**B.      Rulings Under Review:**   Reference to the Final Rule at issue appears in

Petitioners' brief.

**C.      Related Cases:**   Recognizing that original jurisdiction in this Court is

uncertain, Petitioners have filed suit over the same Final Rule in the district court.

*API v. SEC*, No. 12-1668 (D.D.C. filed Oct. 10, 2012).

## DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule

26.1, Oxfam America, Inc. is a nonprofit international development and relief

organization dedicated to finding lasting solutions to poverty and related injustice.

Oxfam America, Inc. has no parent corporation and issues no stock or shares.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................... ii

GLOSSARY ........................................................................................ viii

COUNTER STATEMENT REGARDING JURISDICTION ...................................1

STATUTES AND REGULATIONS ...........................................................1

INTRODUCTION ..................................................................................1

STATEMENT OF FACTS .........................................................................2

SUMMARY OF ARGUMENT .................................................................10

ARGUMENT .......................................................................................11

   I.    This Court lacks jurisdiction to hear this Petition for Review....................11

   II.   The Commission's cost-benefit analysis was adequate and reasonable.......14

   III.  The Commission satisfied the notice and comment requirements of the APA and was not required to re-propose the Final Rule.......................16

   IV.  The Commission properly declined to grant exemptions to accommodate alleged foreign disclosure prohibitions. ........................................17

   V.   The Commission properly concluded that Cardin-Lugar requires public disclosure. ....................................................................................22

   VI.  Neither Section 13(q) nor Rule 13q-1 violates Petitioners' First Amendment rights. .........................................................................................24

   VII. Even if the Commission erred, remand without vacatur would be the proper remedy. .............................................................................. 31

CONCLUSION ....................................................................................31

## TABLE OF AUTHORITIES

**CASES**                                                                    **PAGE**

*Acumenics Research & Tech. v. Dep't of Justice,*
  843 F.2d 800 (4th Cir. 1988) ................................................................................23

*Air Transp. Ass'n v. CAB,*
  732 F.2d 219 (D.C. Cir. 1984)...............................................................................16

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n,*
  988 F.2d 146 (D.C. Cir. 1993)...............................................................................31

*API v. EPA,*
  684 F.3d 1342 (D.C. Cir. 2012) ................................................................... 16 n.16

*API v. OSHA,*
  581 F.2d 493 (5th Cir. 1978) ...................................................................... 14 n.13

*Basic Inc. v. Levinson,*
  485 U.S. 224 (1988) ................................................................................... 27 n.20

*Blount v. SEC,*
  61 F.3d 938 (D.C.Cir. 1995) ...............................................................................29

*Business Roundtable v. SEC,*
  647 F.3d 1144 (D.C. Cir. 2011)................................................................... 12 n.10

*Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N.Y.,*
  447 U.S. 557 (1980) ...............................................................................................29

*Chamber of Commerce of the United States v. SEC,*
  443 F.3d 890 (D.C. Cir. 2006)..................................................................... 16, 17

*Charter Commc'ns, Inc. v. FCC,*
  460 F.3d 31 (D.C. Cir. 2006)................................................................................14

\* Asterisks denote authorities principally relied upon.

*Connecticut Light & Power Co. v. Nuclear Regulatory Comm'n*,
   673 F.2d 525 (D.C. Cir. 1982)..............................................................................17

*Ctr. for Pub. Integrity v. Dep't of Energy*,
   191 F. Supp. 2d 187 (D.D.C. 2002) ....................................................................23

*Dun & Bradstreet, Inc. v. Greenmoss Builders*,
   472 U.S. 749 (1985) ............................................................................................25

*Duncan v. Walker*,
   533 U.S. 167 (2001) ..................................................................................... 11-12

*F. Hoffmann-La Roche Ltd. v. Empagran SA*,
   542 U.S. 155 (2004) ................................................................................... 21 n.18

*F.C.C. v. National Citizens Committee for Broadcasting*,
   436 U.S. 775 (1978) ............................................................................................15

*First Value Advisors LLC v. SEC*,
   633 F.3d 1101 (D.C. Cir. 2011) ..........................................................................22

* *Five Flags Pipe Line Co. v. Dep't. of Transp.*,
   854 F.2d 1438 (D.C. Cir. 1988)...........................................................................12

*Funeral Consumer Alliance, Inc. v. FTC*,
   481 F.3d 860 (D.C. Cir. 2007).............................................................................13

*Glickman v. Wileman Bros. & Elliott, Inc.*,
   521 U.S. 457 (1997) ............................................................................................28

*Heartland Regional Med. Ctr. v. Sebelius,*
   566 F.3d 193 (D.C. Cir. 2009).............................................................................31

*Independent Petroleum Ass'n of Am. v. Babbitt*,
   235 F.3d 588 (D.C. Cir. 2001)................................................................... 12 n.10

*Investment Co. Inst. v. CFTC,*
   _ F. Supp. 2d _, 2012 WL 6185735 (D.D.C. Jan. 2, 2013)..................................16

iii

*Laker Airways Ltd. v. Sabena*,
    731 F.2d 909 (D.C. Cir. 1984).............................................................. 20, 20 n.17

*Mayo Foundation for Med. Edu. and Res. v. U.S.*,
    131 S. Ct. 704 (2011) ...........................................................................23

*McDonnell Douglas Corp. v. NASA*,
    180 F.3d 303 (D.C. Cir. 1999) .............................................................23

*Milk Train, Inc. v. Veneman*,
    310 F.3d 747 (D.C. Cir. 2002)..............................................................31

*Murray v. Schooner Charming Betsy*,
    6 U.S. (2 Cranch) 64 (1804) .................................................................20

*Nat'l Ass'n of Home Builders v. EPA*,
    682 F.3d 1032 (D.C. Cir. 2012).............................................................14

*Nat'l Auto. Dealers Ass'n v. FTC*,
    670 F.3d 268 (D.C. Cir. 2012)...............................................................13

*Nat'l Elec. Mfrs. Ass'n v. Sorrell*,
    272 F.3d 104 (2d Cir. 2001) ........................................................... 30 n.21

*Ohralik v. Ohio State Bar*,
    436 U.S. 447 (1978) ..............................................................................25

*Paris Adult Theatre I v. Slaton*,
    413 U.S. 49 (1973) ...............................................................................25

* *Pharmaceutical Care Management Ass'n v. Rowe*,
    429 F.3d 294 (1st Cir. 2005) ............................................. 26, 30 n.21

*Planned Parenthood v. Casey,*
    505 U.S. 884 (1992) ....................................................................... 27-28

*R.J. Reynolds Tobacco Co. v. FDA*,
    696 F.3d 1205 (D.C. Cir. 2012).............................................................29

iv

*Riley v. National Fed. of the Blind of North Carolina, Inc.*,
487 U.S. 781 (1988) ...........................................................................................29

\* *S.E.C. v. Wall Street Publishing Ins't., Inc.*,
851 F.2d 365 (D.C. Cir. 1988)................................................................ 24, 27, 28

\* *Schiller v. Tower Semiconductor Ltd.*,
449 F.3d 286 (2d Cir. 2006) ......................................................................... 19, 21

*Sosa v. Alvarez-Machain*,
542 U.S. 692 (2004) ................................................................................... 21 n.18

*Spirit Airlines, Inc. v. U.S.*,
687 F.3d 403 (D.C. Cir. 2012)..........................................................................29

*Tcherepnin v. Knight*,
389 U.S. 332 (1967) .........................................................................................25

*United Steelworkers of Am. v. Marshall*,
647 F.2d 1189 (D.C. Cir. 1980)................................................................. 14 n.13

*Wooley v. Maynard*,
430 U.S. 705 (1977) .........................................................................................29

## STATUTES

Act of Dec. 21, 2000
Pub. L. No. 106-554, § 205(2)(c), 114 Stat. 2763...................................... 13 n.12

Dodd-Frank Wall Street Reform and Consumer Protection Act,
Pub. L. No. 111- 203, 124 Stat. 1376 (July 21, 2010) ..........................................4
Section 1503, 124 Stat. 2218-20.................................................................. 9 & n.8

Market Reform Act of 1990,
Pub. L. No. 101-432, 104 Stat. 963, 975 (1990) .............................. 12-13 & n.12

5 U.S.C. § 552...................................................................................................23

15 U.S.C. § 45(c) ..............................................................................................13

Securities Exchange Act of 1934, 15 U.S.C. 78a, *et seq.* ........................................10
    Section 3(f), 15 U.S.C. § 78c(f)................................................................14
    Section 13(a), 15 U.S.C. § 78m(a)...................................................... 26-27
    Section 13(p), 15 U.S.C. § 78m(p).........................................................9 n.7
    Cardin-Lugar, Section 13(q), 15 U.S.C. § 78m(q) ..........................................1, 4
    Section 23(a)(2), 15 U.S.C. § 78w(a)(2) ..............................................14
    Section 25(a), 15 U.S.C. § 78y(a) .......................................................11
    Section 25(b), 15 U.S.C. § 78y(b).......................................................11

15 U.S.C. § 80a-2(c) ...............................................................................14

**REGULATORY MATERIALS**

17 CFR § 229.101(c)(1) ...........................................................................27

17 C.F.R. § 229.101(d)(3)...........................................................................27

17 C.F.R. § 229.1201 ...............................................................................27

* Disclosure of Payments by Resource Extraction Issuers (Final Rule),
    Release No. 34-67717, 77 FR 56,365 (Sept. 12, 2012)................. 4, 5, 7, 8, 9, 15,
    15 n.14, 16, 17,
    19, 20 n.17, 21,
    21 n.19, 22, 23,
    26, 27 n.20, 31

Disclosure of Payments by Resource Extraction Issuers (Proposed Rule), Release
    No. 34-63549, 75 FR 80,978 (Dec. 23, 2010) ........................................7

Mine Safety Disclosure,
    Release No. 33-9286, 76 FR 81,762 (Dec. 28, 2011) ......................................9 n.8

**LEGISLATIVE MATERIALS**

156 Cong. Rec. S3815-3816 (May 17, 2010) .........................................................30

156 Cong. Rec. S3817-18 (May 17, 2010) ...........................................................4

156 Cong. Rec. S5902-01 (July 15, 2012) ...........................................................4

Energy Security Through Transparency Act (ESTTA),
S. 1700, 111th Cong. (2009) ............................................................................3, 4

Extractive Industries Transparency Disclosure Act (EITDA),
H.R. 6066 & S. 3389, 110th Cong. (2008) ............................................... 3, 4, 22

STAFF OF S. COMM. ON FOREIGN RELATIONS, 110TH CONG., THE PETROLEUM AND
POVERTY PARADOX (Oct. 2008) ...........................................................................1

## OTHER AUTHORITIES

Ahmed Rasheed, *Analysis: Kurdish oil deals have Baghdad in a bind*, REUTERS
(Sept. 6, 2012) .......................................................................................................3

Division of Corporation Finance Staff,
Legal Bulletins Nos. 1 (February 28, 1997) and
1A (July 11, 2001, as amended) .............................................................. 21-22 n.19

Exec. Order No. 13,609, 77 FR 26,413 ....................................................... 20 n.17

Restatement (Third) of Foreign Relations Law
§402 ...................................................................................................... 21 n.18
§441 ...................................................................................................... 21 n.18

Sarah N. Lynch & Timothy Gardner, *U.S. State Dept backs rule on foreign
payments for firms*, REUTERS (Jan. 10, 2012) .....................................................30

Thomas Lee Hazen,
*The Law of Securities Regulation* (6th ed. 2009) ...............................................25

# GLOSSARY

| | |
|---|---|
| API | American Petroleum Institute *et al.* |
| API Br. | Brief for Petitioners (DN 1413016) (Dec. 3, 2012) |
| API Reply on Jurisdiction | Petitioners' Reply in Support of Emergency Motion to Determine Jurisdiction (DN 1402390) (Oct. 31, 2012) |
| Cardin-Lugar | 15 U.S.C. § 78m(q) |
| CEA | Commodity Exchange Act |
| Dodd-Frank Act | Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (July 21, 2012) |
| EDGAR | Electronic Data Gathering, Analysis, and Reporting system |
| EITA | Extractive Industries Transparency Initiative |
| EITDA | Extractive Industries Transparency Disclosure Act, H.R. 6066 & S. 3389, 110th Cong. (2008) |
| EITI | Extractive Industries Transparency Initiative |
| ESTTA | Energy Security Through Transparency Act, S. 1700, 111th Cong. (2009) |
| Exchange Act | Securities Exchange Act of 1934, 15 U.S.C. § 78 *et seq.* |
| Exxon | Exxon Mobil Corporation |

| | |
|---|---|
| Final Rule | Disclosure of Payments by Resource Extraction Issuers, Release No. 34-67717, 77 FR 56, 365 (Sept. 12, 2012) |
| FR | Federal Register |
| FTCA | Federal Trade Commission Act |
| JA__ | Joint Appendix page citation |
| MRA | Market Reform Act of 1990, Pub. L. No. 101-432, 104 Stat. 963, 975 (1990) |
| POVERTY PARADOX | STAFF OF S. COMM. ON FOREIGN RELATIONS, 110TH CONG., THE PETROLEUM AND POVERTY PARADOX (Oct. 2008) |
| Proposed Rule | Disclosure of Payments by Resource Extraction Issuers, 34-63549, 75 FR 80,978 (Dec. 23, 2010) |
| RDS | Royal Dutch Shell |
| SA__ | Supplemental Appendix page citation |
| SEC or Commission | Securities and Exchange Commission |
| SEC Br. | Brief of Respondent Securities and Exchange Commission (DN 1413016) (Jan. 2, 2013) |
| SEC Resp. on Jurisdiction | SEC Response To Emergency Motion To Determine Jurisdiction (DN 1401068) (Oct. 23, 2012) |

## COUNTER STATEMENT REGARDING JURISDICTION

This Court lacks jurisdiction over this Petition.

## STATUTES AND REGULATIONS

Applicable statutes and regulations are contained in Petitioners' Brief.

## INTRODUCTION

Signature bonuses for Angolan petroleum contracts "exceeding $1 billion" disappear into government coffers but are not included in public reports, "embolden[]ing" "anti-reform elements" opposed to U.S. interests.[1]   Untold millions are transferred to the Kurdish Regional Government – a "complete black hole" of transparency[2] – threatening to disrupt the tenuous stability in Iraq that thousands of American lives helped pay for. Western oil companies pour billions of dollars into the hydrocarbons sector in Equatorial Guinea, helping a dictatorial regime maintain "[p]ower, which is synonymous with information about and control over finances," while its people remain impoverished.[3]

These are just a few of the developments Congress considered in adopting 15 U.S.C. § 78m(q) (hereafter "Cardin-Lugar," after its sponsors).  Acting to protect investors, secure political stability and energy security, and advance the interests of poor communities, Congress passed a narrowly tailored provision

---

[1] *See* STAFF OF S. COMM. ON FOREIGN RELATIONS, 110th Cong., THE PETROLEUM AND POVERTY PARADOX, at 30, 31 (Oct. 2008) ("POVERTY PARADOX").
[2] *Id.* at 72.
[3] *Id.* at 17, 33-34.

1

requiring all publicly listed oil, gas, and mining companies ("issuers") to publicly

disclose the payments they make to governments.

During the ensuing rulemaking process, the American Petroleum Institute *et al.* ("Petitioners" or "API") and the issuers they represent attempted to gut the law, claiming astronomical costs unjustified by the evidence, and demanding exemptions conflicting with the clear language and intent of the statute. The Securities and Exchange Commission ("SEC" or "Commission") carefully considered each of these claims and sensibly dismissed most of them. Nonetheless, API erroneously asserts that SEC's regulatory choices were unjustified. Moreover, it presents the novel claim that disclosure of factual information violates the First Amendment; a challenge that would call into question thousands of reporting statutes and regulations. There simply is no constitutional right to keep payments to foreign governments secret. Because this Court lacks jurisdiction to hear this Petition in the first instance and API's arguments lack merit, its challenges must fail.

## STATEMENT OF FACTS

*1.  Cardin-Lugar addressed the resource curse, investor risk, and energy security*

Cardin-Lugar addressed a number of critical foreign and domestic policy challenges: the resource curse, *i.e.* the destructive consequences of secret payments to governments by extractive industries, which affect economies and communities,

the security of investments in extractive companies, and the stability of U.S.

energy supplies.  At the request of Ranking Member Richard Lugar, Senate

Foreign Relations Committee staff prepared a 2008 report detailing these concerns.

*See* POVERTY PARADOX, *supra* n.1, at 2-3, 25.

Committee staff found that the resource curse "damages U.S. foreign policy

and humanitarian interests abroad" and "negatively impacts Americans at home."

*Id.* at 2. They cited concrete examples from strategically important countries, and

called for legislative action to supplement the voluntary Extractive Industries

Transparency Initiative ("EITI").  Their concerns proved prescient when last year,

Exxon Mobil Corporation ("Exxon") signed contracts directly with the Kurdistan

Regional Government, provoking a political firestorm and threatening the stability

of Iraq. *See* Ahmed Rasheed, *Analysis: Kurdish oil deals have Baghdad in a bind*,

REUTERS (Sept. 6, 2012), *at* http://in.reuters.com/article/2012/09/06/us-iraq-oil-

kurdistan-idINBRE8850JA20120906.

POVERTY PARADOX was prepared in the wake of the bipartisan Extractive

Industries Transparency Disclosure Act ("EITDA"), H.R. 6066 & S. 3389, 110th

Cong., (2008), which was introduced to require disclosure of extractive payments

to government through securities laws.  The EITDA was not enacted that year, and

in 2009, proponents introduced the Energy Security Through Transparency Act

("ESTTA"), S. 1700, 111th Cong., (2009).  Despite minor differences, both bills

required the SEC to promulgate rules mandating that issuers report government payments in their public annual reports, and also called on the SEC to separately present a compilation of the information online. *See* EITDA § 3(a)(1) & (c); ESTTA § 6(2)(A) & (3)(A); Cardin-Lugar, 15 U.S.C. § 78m(q)(2)(A) & (3)(A).

In 2010, a slightly adapted form of the ESTTA was passed as Section 1504 of the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111- 203, 124 Stat. 1376 (July 21, 2010) ("Dodd-Frank Act"), through the bipartisan Cardin-Lugar Amendment.  The U.S. thus became the third securities regulator, after the London Stock Exchange Alternative Investment Market and the Hong Kong Stock Exchange, to require extractive companies to disclose their payments to investors and the public.  *See* Disclosure of Payments by Resource Extraction Issuers (Final Rule), Release No. 34-67717, 77 FR 56,365, 56, 367 n.15 (Sept. 12, 2012) ("Final Rule").  Congressional proponents hailed a "new international standard" of transparency, 156 Cong. Rec. S3817-18 (May 17, 2010) (Sen. Dodd), and explained that benefits would accrue in the form of better-managed revenues for resource-rich communities, a more stable investment climate, and stronger energy security. *See, e.g.*, 156 Cong. Rec. S5902-01 (July 15, 2012) (investors will know more about investments "in dangerous or unstable parts of the world") (Sen. Leahy); SEC Br. at 15-16, 46.

   2.  *Industry commentators sought anomalous and unsupported*
       *interpretations of Cardin-Lugar*

After a pre-proposal comment period, the SEC published a Proposed Rule,

which created no pre-determined exemptions and required public disclosure.  75

FR 80,987/3, 80,989/2-3, 80,985/3.

With regard to the possibility of foreign disclosure prohibitions, the

Proposed Rule specifically asked commentators to "identify the specific law and

the corresponding country" if any existed. 75 at 80,988/1.  Industry commentators

suggested just four countries – Angola, Cameroon, China, and Qatar – and

identified no law unambiguously prohibiting disclosures.

Exxon submitted an Angolan decree providing that companies should not

disclose information about petroleum activities "without previous formal

authorization from the Minister of Petroleum." JA__510.  Other commentators

noted that companies regularly disclose Angolan payment information, suggesting

that the Minister routinely grants the requisite authorization. *E.g.*, JA__566.

Indeed, the Angolan government's model Production Sharing Agreement allows

disclosure pursuant to securities regulations. JA__565.

Royal Dutch Shell ("RDS") submitted a Cameroonian decree requiring

confidential treatment of, *inter alia*, "data . . . and other information provided by

the Title Holder . . . [.]" JA__519.  RDS conceded that the decree does "not

expressly state that payment information is confidential" but concluded without

analysis that courts *might* interpret the term "data" to cover such information.

JA__517.  Confidential treatment does *not* apply to information that must "be

disclosed in accordance with legislative or regulatory provisions in force or with a

ruling of a competent court." JA__520.  One Cameroonian lawyer explained that

Cameroon law includes a presumption of disclosure and disputed that government

payments fell under the terms of the decree.  SA__644-45.  Like Angola,

Cameroon's Model Oil Contract permits disclosure. SA__645.[4]

RDS also submitted a legal opinion explaining that no Chinese law explicitly

prohibits disclosure. JA__529.  The opinion asserts that disclosures might

nevertheless be considered "state secrets" or "business secrets" *if* they could be

used to deduce reserves and production volumes or were designated as confidential

in government contracts. JA__530, 531.  Other commentators, including investors,

explained that Cardin-Lugar disclosures cannot be used to calculate such

information, SA__650.  Some noted that certain companies disclose payment

information on their Chinese operations, *e.g.*, JA__567, and one issuer with

operations in China asserted it had no knowledge of disclosure prohibitions in its

countries of operation.  *Id.*; SA__675.  Moreover, RDS's legal opinion notes that

RDS's Chinese contracts *allow* disclosure to home state regulators, JA__531.

---

[4] *See also* JA__621 (noting Association of Independent Petroleum Negotiators
model contract clause allowing disclosure pursuant to law or stock exchange
requirement).

Finally, Exxon submitted a Qatari ministerial letter instructing Exxon not to disclose "commercially sensitive information, including without limitation that on actual or projected production costs, revenues or reserves," JA__512, *none of which* Cardin-Lugar requires or, as noted *supra*, can be calculated from the disclosures.

Despite the absence of evidence for disclosure prohibitions, industry commentators predicted "billions of dollars" in losses if forced to disclose government payments. JA__539.

Industry commentators also insisted that the SEC withhold individual company disclosures from publication and limit public disclosure to a broadly aggregated compilation. *E.g.*, JA__242-44.  Most other commentators opposed this as contrary to the statute, *e.g.*, JA__435-37; fourteen U.S. Representatives and five U.S. Senators also commented that they had intended public disclosures. SA__678-79, 680.

The Commission asked for "empirical data and other factual support" on costs and benefits.  Disclosure of Payments by Resource Extraction Issuers (Proposed Rule), Release No. 34-63549, 75 FR 80,997/3 (Dec. 23, 2010).   Only a few industry commentators submitted compliance cost estimates, *see* 77 FR 56,408/2, 56,410/2; none explained their estimates in detail.  Other commentators noted that companies must already track their government payments for regulatory

purposes, indicating *de minimis* compliance costs. JA__548.  Aside from purported

losses due to foreign disclosure prohibitions, *see supra* at 7, industry commentators

provided no further cost estimates.

Commentators – in particular, investors with over one trillion dollars under

management, collectively[5] – identified numerous benefits of the rule.  These

included "increas[ing] the accountability of governments to their citizens in

resource-rich countries" *see* 77 FR 56,398/2, "supporting stable and democratic

governments," JA__533, and helping investors to more accurately calculate risk.

SA__698 ("Disclosure . . . *is clearly and unequivocally of material importance to*

*investors* . . . [and] will provide investors and investment managers important

insights into the political risks facing the companies they research, and in which

they may invest.").[6]  Some comments described how reporting would enable

---

[5] *See* TIAA-CREF Comment, Mar. 2, 2011, at 1 (SA__683) ($451 billion);
CalPERS Comment, Feb. 28, 2011, at 1 (SA__687) ($229 billion); CalSTRS
Comment, Mar. 1, 2011, at 1(SA__689)  ($125 billion); PGGM Comment, Mar. 1,
2011 (SA__691) (€ 100 billion); Railpen InvestmentsComment, Feb. 25, 2011
(SA__693) ($30 billion); SNS Assets Management, Feb. 28, 2011 (SA__696) ($62
billion); Calvert Investments Comment, Mar. 1, 2011 (SA__646) ($14.8 billion).

[6] *See also* George Soros Comment ("We do not believe that these disclosures are
qualitatively different from those that have historically been required under Section
13 of the Exchange Act.") (SA__701); Catholic Relief Services Comment
("Transparency in extractive payments to governments is important to us as . . .
institutions that are investors and consumers") (SA__705); Syena Capital
Management Comment (SA__708); JA__ 333.

investors calculate risk. *See* SA__656.  As one commentator emphasized, "[T]hese are *shareholder* dollars we are talking about."  SA__698. (emphasis added).

### 3.  *The Final Rule required public disclosure and granted no exemptions*

In the Final Rule, the SEC found that pre-determined exemptions for foreign laws would be inconsistent with the statute. 77 FR 56,372/3.  The SEC also found that Cardin-Lugar requires publication of issuers' disclosures, *id.* at 56,391/1-2, consistent with its sister provisions in the Dodd-Frank Act: Section 1502, on conflict minerals,[7] and Section 1503, on mine safety.[8] The SEC's analysis incorporates every numerical estimate provided by commentators and includes non-quantitative analysis of the likelihood and magnitude of all other costs and benefits. 77 FR 56,398-413.

After the Final Rule was published, API requested a stay pending litigation. The SEC denied the stay, concluding, *inter alia*, that the purported compliance costs were insufficient to justify delay, and API had not demonstrated any likelihood that foreign governments prohibit disclosure, since their evidence was "unpersuasive and vigorously contested. SA__715.

---

[7] *Codified at* 15 U.S.C. §78m(p).
[8] Section 1503 also requires covered issuers to "include" the information in their required reports under the Exchange Act.  Dodd-Frank Act § 1503(a).  The final regulations for Section 1503 require public disclosure; no commentator appears to have argued for non-public disclosure. *See* Mine Safety Disclosure, Release No. 33-9286, 76 FR 81,762 (Dec. 28, 2011).

## SUMMARY OF ARGUMENT

This Court lacks jurisdiction because the Final Rule was not promulgated under one of the provisions to which the Securities Exchange Act of 1934, 15 U.S.C. 78a, *et seq.* ("Exchange Act"), limits direct appellate review. Regardless, the challenges fail on the merits.

The SEC's cost-benefit analysis was sound because it considered the costs and benefits, including those that could be quantified, based on all available evidence. It was not required to re-propose the Final Rule because it accepted all commentators' estimates, gave notice of the materials it intended to use, and made only secondary, supplementary use of extra-record materials. Moreover, API cannot demonstrate prejudice because further comment could not have altered the Commission's determination that the statute mandated its regulatory choices.

The Commission correctly concluded that exemptions for foreign laws would be inconsistent with Cardin-Lugar. Regardless, issuers failed to provide coherent evidence that any countries forbid disclosure. API seeks improperly to reverse the burden and require the Commission to justify *not* creating exemptions. In fact, the SEC's decision is consistent with the statute and legislative history, as well as with international law and SEC precedent. And regardless, API's complaint is premature, as issuers may apply for case-by-case exemptions.

Similarly, the Commission properly concluded that public disclosures are both mandated by Cardin-Lugar, as the statutory text and legislative history agree in this respect.  Regardless, public disclosure is the only reasonable means of implementing Cardin-Lugar.

API's First Amendment argument that the required disclosure of purely factual information is impermissible compelled speech is unprecedented and would call into question untold numbers of laws and regulations.  Regardless, Cardin-Lugar and the Final Rule satisfy any level of constitutional scrutiny.

Finally, even if the Commission had committed some error (which it did not), the correct remedy would be remand, not vacatur, because the Commission could address any methodological or analytical errors, and vacatur would disrupt the statutory scheme.

## ARGUMENT

## I.      This Court lacks jurisdiction to hear this Petition for Review.

This Court lacks original jurisdiction.  API's first argument – that Exchange Act Section 25(a) provides jurisdiction – ignores the distinction between Sections 25(a) and 25(b).  *Compare* 15 U.S.C. § 78y(a)(1) *with* 15 U.S.C. §78y(b)(1). Section 25(a) is limited to review of SEC *orders*, whereas Section 25(b) authorizes jurisdiction over challenges to certain SEC *rules*.  Courts must "give effect, if possible, to every clause and word of a statute." *Duncan v. Walker*, 533 U.S. 167,

174 (2001).  But API's theory – whereby Section 25(a) governs review of all SEC rules – would render Section 25(b) superfluous.[9]

Courts have found original jurisdiction over challenges to both orders and rules in statutes that only mention such review for *orders*, but API's argument would improperly extend this principle to erase all distinction between orders and rules.  API Br. at 28-29.  API points to no case where a court extended appellate jurisdiction to override separate, specific statutory provisions governing rule challenges.[10]  *See Five Flags Pipe Line Co. v. Dep't. of Transp.*, 854 F.2d 1438, 1441 (D.C. Cir. 1988) (this Court "is not at liberty to displace, or to improve upon, the jurisdictional choices of Congress[.]").

Congress has not "acquiesced" in API's interpretation.  API Br. at 29. Specifically, in 1990, Congress amended Section 25(b)(1), adding Section 9(h)(2) to the list of Exchange Act provisions that authorize rules triggering direct appellate review.  Market Reform Act of 1990, Pub. L. No. 101-432, § 6(b), 104

---

[9] API summarily suggests its interpretation gives effect to Section 25(b) because it would limit appellate review in challenges that "required fact-finding by the district court."  API Br. at 29, n.4.  This argument has no textual basis and makes no sense in any event, since there is no fact-finding in APA cases.

[10]     Moreover, in most of API's cases, and also in *Business Roundtable v. SEC*, 647 F.3d 1144, 1146 (D.C. Cir. 2011), the court made no findings on jurisdiction. Courts are "not bound by a prior exercise of jurisdiction in a case where it was not questioned and it was passed *sub silentio.*" *Independent Petroleum Ass'n of Am. v. Babbitt*, 235 F.3d 588, 597 (D.C. Cir. 2001).

Stat. 963, 975 (1990) ("MRA"). [11]  If Congress intended that all rules be subject to

direct appellate review under Section 25(a), this enactment would be superfluous.[12]

API cites *Nat'l Auto. Dealers Ass'n v. FTC*, 670 F.3d 268, 270 (D.C. Cir.

2012), but that case actually indicates that this Circuit defers to clear congressional

delineations between orders and rules.  Specifically, the court declined original

jurisdiction over a challenge to an FTC interpretive rule that regulated certain

unfair commercial practices, reasoning that the Federal Trade Commission Act

(FTCA) granted direct appellate review only for non-interpretive rules. *Nat'l Auto.*

*Dealers Ass'n*, 670 F.3d at 270-71 (citing *Funeral Consumer Alliance, Inc. v. FTC*,

481 F.3d 860 (D.C. Cir. 2007)).  The FTCA also provides for direct appellate

review of cease and desist *orders* for unfair trade practices, 15 U.S.C. § 45(c), but

the court did not find that in this case the term "order" encompasses "rule."

---

[11] API insists that Congress's "acquiescence" can be read in the fact that it has not amended Exchange Act Section 25(a). API Br. at 29.  But Congress has no reason to change Section 25(a), as no court has ever held that it authorizes direct appellate review of Exchange Act rules.

[12] API wrongly speculates that Congress added Section 9(h)(2) to the list in Section 25(b)(1) to clarify direct appellate review for rules on security futures, notwithstanding the more limited review provisions of the Commodity Exchange Act ("CEA").  API Reply on Jurisdiction at 5.  This is impossible; Section 9(h)(2) as enacted by the MRA in 1990 did not refer to futures, but rather to market volatility, which is unconnected to the CEA.  The current Section 9(h)(2), which authorizes regulation of futures, was inserted in 2000, Act of Dec. 21, 2000, P.L. 106-554, § 205(2)(C), 114 Stat. 2763, and caused the original Section 9(h)(2) to be renumbered as 9(i)(2).

API's second jurisdictional argument – that direct appellate review is appropriate because the Final Rules could have been adopted under Exchange Act Section 15(c)(5) or (6), which appears in the direct appellate review list in Section 25(b) – is nonsense.  API Br. at 30-31.  Those subsections address activities of brokers and dealers and are unrelated to Cardin-Lugar.  The Commission explained that the Final Rule was promulgated instead under Section 15(d).  *See* SEC Resp. on Jurisdiction at 2.  Section 15(d) concerns the filing of information by issuers, and is not on the list of provisions subject to direct appellate review under Section 25(b); thus Section 25(b) does not confer original jurisdiction on this Court.

## II.     The Commission's cost-benefit analysis was adequate and reasonable.

The Exchange Act requires that the Commission "consider" costs and benefits,15 U.S.C. §§ 78c(f), 78w(a)(2), 80a-2(c)), not that quantifiable benefits outweigh costs.  API Br. at 38, 41.  Since both were reasonably considered here, the Court must defer to the Commission's judgment.  *Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1040 (D.C. Cir. 2012) ("we review [ ] cost benefit analysis deferentially"); *Charter Commc'ns, Inc. v. FCC*, 460 F.3d 31, 42 (D.C. Cir. 2006).[13]

---

[13] API claims that *API v. OSHA*, 581 F.2d 493 (5th Cir. 1978), *aff'd sub. nom Indus. Union Dept v. API*, 448 U.S. 607 (1980), requires a quantified relationship between costs and benefits.  API Br. at 41.  But the Supreme Court found that even the OSHA statute at issue there did not impose such an obligation.  *See United Steelworkers of Am. v. Marshall*, 647 F.2d 1189, 1245, n.84 (D.C. Cir. 1980).

Moreover, despite API's contention that the Commission did not recognize *any* benefits, API Br. at 39, the Commission appropriately recognized the Rule's potential to increase government accountability, 77 FR 56,398/2, and "improve[] economic development and . . . economic growth." 77 FR 56,403/2.  It also recognized investors' comments that the disclosures would benefit investors by "materially and substantially improv[ing] investment decision making." *Id*. Investors with over one trillion dollars under management supported the Commission's benefit findings, *see supra* at 8 & nn. 5 & 6, refuting API's dismissal of these findings as "preposterous."  API Br. at 39.

The Commission also reasonably considered and quantified costs; indeed, for the purpose of the cost-benefit analysis, the Commission essentially assumed as accurate industry's dire assessments of direct and indirect costs.  *See* SEC Br. at 32-36.[14]  Thus API cannot challenge the Commission's cost predictions as "unreasonable" based on the available evidence.  Reasonable cost predictions are all that is required.  *E.g., F.C.C. v. National Citizens Committee for Broadcasting*, 436 U.S. 775, 813-814 (1978) (where analysis is of a "judgmental or predictive nature – *e.g.* . . . . whether losses to existing owners would result from forced

_____

[14] The Commission also identified mitigating factors that could lessen the risk of certain purported costs, such as those due to foreign disclosure prohibitions.  77 FR 56,403/1-2 & n.584.

sales . . . complete factual support in the record for the Commission's judgment or prediction is not possible or required").[15]

### III.   The Commission satisfied the notice and comment requirements of the APA and was not required to re-propose the Final Rule.

The Commission was not required, as API claims, to provide additional opportunity to comment. API Br. at 45-6.  First, the Commission specifically requested empirical cost data in the Proposed Rule. 75 FR 80,997/3. This request was functionally identical to one this Circuit found provided adequate opportunity to comment. *Chamber of Commerce of the United States v. SEC*, 443 F.3d 890, 901 (D.C. Cir. 2006) ("*Chamber II*"); *see also Air Transp. Ass'n v. CAB,* 732 F.2d 219, 224 (D.C. Cir. 1984) (commentators were aware of the types of material agency was seeking and would rely on). API thus had sufficient notice that the Commission would use data from the comments to estimate compliance costs.

Second*,* the Commission did exactly that, relying "particularly on those comment letters that provided quantification and were transparent about their methodologies." 77 FR 56,408; *cf. Chamber II,* 443 F.3d at 902-3.  API cannot fault the Commission for using almost exclusively the data that industry provided.

---

[15] API's comparisons to inadequate cost-benefit analyses in other cases, API Br. at 37, 44, also fail because the Commission engaged in a robust cost-benefit analysis that credited all industry concerns.  *See API v. EPA*, 684 F.3d 1342, 1351 (D.C. Cir. 2012) (rejecting challenge based on *Business Roundtable*); *Investment Co. Inst. v. CFTC*, _ F. Supp. 2d _, 2012 WL 6185735, *44-50 (D.D.C. Jan. 2, 2013) (same).

Third, the extra-record study to which API objects, API Br. at 45, was used solely as supplementary evidence to verify commentators' estimates of competitive costs. 77 FR 56,412/2-3.  Agencies may use extra-record evidence to supplement the record without providing for additional comment.  *See, e.g. Chamber II,* 443 F.3d at 900.

In any event, API cannot demonstrate prejudice.  Even assuming the Commission underestimated costs, that would not have changed the Final Rule; there is no "uncertainty as to the effect . . . [.]".  *See Chamber II,* 443 F.3d. at 904. Besides the fact that it found the regulatory choices to which API objects were *required* by Cardin-Lugar, SEC Br. at 38-39, the Commission later concluded that the evidence for industry's most extreme cost estimates was unpersuasive.  *See supra* at 9.

In short, the "most critical factual material" used to support the Commission's methodologies was public, *Chamber II*, 443 F.3d at 902, API had sufficient notice and exhaustive opportunity to comment, and any variance in the Final Rule was clearly a "logical outgrowth" of the Proposed Rule, *Connecticut Light & Power Co. v. Nuclear Regulatory Comm'n*, 673 F.2d 525, 533 (D.C. Cir. 1982).  No further opportunity to comment was necessary.

**IV.    The Commission properly declined to grant exemptions to accommodate alleged foreign disclosure prohibitions.**

The SEC was correct that exemptions would be inconsistent with the statute. The determinations not to grant exemptions is also consistent with the record, international law, and SEC precedent.  Even if the statute did *not* preclude exemptions, API's complaint is premature, as issuers may apply for case-by-case exemptions.

A. *API identifies no evidence justifying exemptions*

Issuers asserted four countries prohibited disclosures, but they provided not a single legal document unambiguously supporting their claims.  For Cameroon and China, the documents provided expressly concede that no law explicitly prohibits disclosures. *See supra* at 6. For Angola, Cameroon, and China, the documents show that provisions *allowing* disclosure are standard features of government contracts, and, at worst, issuers can obtain disclosure authorization from the government. *See supra* at 5-6.  Cameroon expressly allows disclosure where required by law. *See supra* at 5.  Qatar's list of information that issuers should refrain from disclosing *does not* include government payments. *See supra* at 7.  Thus issuers' "unpersuasive" evidence "failed to establish sufficient certainty of an injury." SA__715.

API's wild cost predictions, API Br. at 57-58, enjoy even less support.  API recycles RDS's claim that issuers would lose billions by withdrawing from operations in countries prohibiting disclosures. *Id.* at 18.  Yet even assuming

disclosure prohibitions exists, API fails to show that 1) issuers could not obtain

disclosure authorizations or 2) even without authorizations, they would face *any*

penalties for disclosing, much less have to withdraw.  *See* 77 FR 56,372 n.84

(evidence that issuers already disclose payments in Angola, Cameroon, and China);

SA__715.  As API cannot show that prohibitions exist or that – if they did – issuers

would incur costs, the Commission did not err in declining to adopt blanket

exemptions.

     B. *The Commission was not required to justify not granting an exemption*

     API improperly attempts to shift the burden to the Commission to justify *not*

exercising its exemptive power.  But that power is inherently discretionary.  The

Commission "has considerable regulatory discretion" to grant exemptions that are

"not inconsistent with the public interest or the protection of investors," but it is

*never* required to do so and need not make formal determinations. *Schiller v.

Tower Semiconductor Ltd.*, 449 F.3d 286, 297 (2d Cir. 2006).  Thus, the

Commission may decline to grant an exemption, *regardless of whether* the

exemption would be consistent with investor protection and the public interest.

     Thus the Commission was not required to assess the degree to which

disclosure from the four purportedly prohibiting countries was necessary to

accomplish Congress's aims, API Br. at 57-58, or to distinguish this rulemaking

from other exercises of its discretionary exemptive authority.  API Br. at 55-56.[16]

The burden was on *proponents* to convince the Commission to exercise that

authority, and not on the Commission to justify *not* exercising it.

### C. *The* Charming Betsy *doctrine does not apply where there is no conflict with international – as opposed to foreign – law*

Nothing in *Charming Betsy* requires an exemption for foreign prohibitions.

API Br. at 56.  The canon that statutes are construed where possible to avoid

international law conflicts, *Murray v. Schooner Charming Betsy*, 6 U.S. (2 Cranch)

64, 118 (1804), does not apply, since Congress's intent to require disclosure is

clear. SEC Br. at 47; *see Laker Airways Ltd. v. Sabena*, 731 F.2d 909, 953 (D.C.

Cir. 1984) (statutes apply despite conflict with international law).[17]

Regardless, API confuses international and foreign law conflicts. Pet. Br. at

15, 56. *Charming Betsy* applies to the former, but API alleges only the latter.

---

[16] The exemptions API cites do not remotely resemble those requested here; they apply only to *foreign* entities in their home jurisdictions or involve exceptions to the rules adopted by the Commission absent a specific congressional mandate. API Br. at 15.

[17] Executive Order No. 13,609 does not apply to independent agencies like the SEC. *Id.* § 4(a), 77 FR 26,414 (May 4, 2012).  Even if it did, the SEC found that exemptions would be inconsistent with the law, 77 FR 56,413/1; exemptions therefore would not be required by the Executive Order. Exec. Order. No. 13,609 § 1, 77 FR 26,413.  Indeed, the Executive lacks authority to undermine a statute to avoid conflict with foreign law. *Laker*, 731 F.2d at 953-55 and n. 175.

Nothing in international law bars the SEC from requiring issuers of U.S. securities to disclose information critical to U.S. interests, in the U.S.[18]

> D. *Even if the statute permits exemptions, then API's challenge on exemptions is premature.*

Even if the statute did not preclude exemptions, API's challenge to the decision not to grant blanket exemptions would be premature because the Commission may issue case-by-case exemptions. *Schiller*, 449 F.3d at 298. With the proper evidence, issuers might apply for a disclosure exemption based on foreign law in the unlikely case that did not implicate the concerns of Congress or the Commission – the danger of harming investors and communities or undermining Cardin-Lugar by encouraging the enactment of blocking statutes or reinterpretation of pre-existing statutes.[19] *See* 77 FR 56,372-73. Because case-by-

---

[18] A regulation conflicting with foreign law that is an "unreasonable exercise of prescriptive jurisdiction" could violate international law. *F. Hoffmann-La Roche Ltd. v. Empagran SA*, 542 U.S. 155, 164 (2004). But this Rule is not. The U.S. may regulate the operations of any person – foreign or domestic – while in the United States. Restatement (Third) of Foreign Relations Law ("Restatement") § 402(1). Moreover, since the Rule requires disclosure in the United States, international principles would accord preference to our law. *Id.* § 441 cmt. a; § 441(2)(a). Likewise, the U.S. may regulate the actions of all U.S. persons, both at home and abroad. *Id.* § 402(2), *see also Sosa v. Alvarez-Machain*, 542 U.S. 692, 761 (2004) (Breyer, J., concurring).

[19] The Commission notes in the Rule Release that required disclosures would not "generally" be afforded confidential treatment. 77 FR 56,391 n.400. Under "unusual circumstances," however, even required disclosures may be subject to confidential treatment. *See* Division of Corporation Finance Staff Legal Bulletins

case determination would provide relief from all potential harms, if the Court were to determine that the statute does not bar exemptions, the balance of API's challenge is premature.  *See First Value Advisors LLC v. SEC,* 633 F.3d 1101 (D.C. Cir. 2011) (challenge to disclosures premature where company may seek exemption).

### V.      The Commission properly concluded that Cardin-Lugar requires public disclosure.

Cardin-Lugar's text, history, and context all prove the Commission correctly determined that Cardin-Lugar requires public disclosure.  Since its first incarnation as the EITDA, Cardin-Lugar has required both public disclosure and a public compilation. *See supra* at 3-4.  API's assertion that the later versions of the bill abandoned the EITDA's original mandate to post the disclosures on the Commission's "EDGAR system," is false. API Br. at 6-7.  Indeed, EITDA's only reference to EDGAR is an explanatory remark clarifying that the compilation should be available *outside* the EDGAR system. S. 3389 § 3(c).

Moreover, Congress signaled its intent for public disclosure by inserting Cardin-Lugar in Section 13 of the Exchange Act, which creates the public reporting regime for listed companies.  SEC Br. 40; 77 FR 56,391 n.400.  Cardin-Lugar's proponents expressed this intent throughout the legislative and

---

Nos. 1 (February 28, 1997) and 1A (July 11, 2001, as amended), *available at* http://www.sec.gov/interps/legal/slbcf1r.htm.

administrative process.  SEC Br. at 15-16; *see also supra* at 7 (citing congressional comment letters).

But even if the Court were to conclude that Cardin-Lugar does not *mandate* public reporting, SEC did not err because it was reasonable for the Commission to decline API's request for secret reporting.  *E.g. Mayo Foundation for Med. Edu. and Res. v. U.S.*,  131 S. Ct. 704, 714-15 (2011) (deferring to agency's reasonable interpretation of statutory authority).  First, the purpose of Cardin-Lugar is to allow advocates and investors to utilize the payment information.  Secret reporting would defeat that purpose.

Second, contrary to API's claim, API Br. at 49, the Commission reasonably concluded that the information would likely become public under the Freedom of Information Act, 5 U.S.C. § 552, *as amended*, in any event.  77 FR 56,401/2. Unlike in *McDonnell Douglas Corp. v. NASA*, payment information is unlikely to cause "substantial harm to [issuers'] competitive position," 180 F.3d 303, 306 (D.C. Cir. 1999), as sensitive information is based on too many factors to be calculable solely from payment data.  *See* JA__371-372; *Ctr. for Pub. Integrity v. Dep't of Energy*, 191 F. Supp. 2d 187 (D.D.C. 2002) (sensitive oil pricing information is "based on multiple factors, including reserve estimates, future cash flow price projections, and risk factors"); *see also Acumenics Research & Tech. v. Dep't of Justice*, 843 F.2d 800, 808 (4th Cir. 1988).

### VI.    Neither Section 13(q) nor Rule 13q-1 violates API's First Amendment rights.

API's Free Speech challenge fails because disclosures of purely factual information have never been considered to compel speech in violation of the First Amendment.  SEC Br. at 54-60.  Petitioners' challenge is especially meritless in the securities regulation context; Cardin-Lugar disclosures are not subject to heightened scrutiny but could, regardless, meet even the strictest scrutiny.

### A.    *Petitioners' far-reaching attack on securities regulation is unprecedented*

Cardin-Lugar and the Final Rule require issuers to inform the market about government payments.  Although investors lauded this disclosure as enhancing investor protection, API asserts a novel First Amendment right to conceal such information.  API Br. at 31-36.

This Circuit has rejected efforts to expose securities regulation to heightened First Amendment scrutiny.  Instead, "regulation of the exchange of information regarding securities is subject only to *limited* First Amendment scrutiny." *S.E.C. v. Wall Street Publishing Inst., Inc.*, 851 F.2d 365, 373 (D.C. Cir. 1988) (emphasis provided).  Indeed, "[i]f speech employed directly or indirectly to sell securities were totally protected, any regulation of the securities market would be infeasible – and that result has long since been rejected." *Id.* at 372.  Thus, the Supreme Court has frequently noted that securities-related speech and disclosure can be regulated

"without offending the First Amendment." *Ohralik v. Ohio State Bar*, 436 U.S. 447, 456 (1978); *see also Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 61-62 (1973); *Dun & Bradstreet, Inc. v. Greenmoss Builders*, 472 U.S. 749, 758, fn. 5 (1985).

API's approach would threaten the entire securities regime because compelled disclosure is the *sine qua non* of securities regulation.  Investors cannot value securities by inspecting them and thus require "a continuous flow of information . . . [.]"  Thomas Lee Hazen, *The Law of Securities Regulation* (6th ed. 2009), § 1.1[I].  Accordingly, "one of [the Exchange Act's] central purposes is to protect investors through the requirement of full disclosure… [.]"  *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967).

Pulling at this strand of the Exchange Act's disclosure regime threatens to unwind the whole garment – based on a proposition that the Supreme Court has *never* entertained and this Circuit has expressly *rejected*.

B.    *There is nothing constitutionally unique about Cardin-Lugar disclosures*

Petitioners suggest that Cardin-Lugar and the Final Rule constitute an unprecedented disclosure regime.  But Petitioners posit only that this disclosure "is not necessary to protect investors" and compels speech "for the sake of speech itself."  API Br. at 31, 35-36.

Congress, investors, and the Commission, however, concluded otherwise; Cardin-Lugar makes available information for the sake of *investors*.  *Supra* at 4, 8. It is, therefore, just like any other Exchange Act disclosure, or for that matter, any of the "literally thousands" of regulations requiring "disclosure of economically significant information designed to forward ordinary regulatory purposes."  *See Pharmaceutical Care Management Ass'n v. Rowe*, 429 F.3d 294, 316 (1st Cir. 2005) (finding First Amendment argument like API's "completely without merit"); SEC Br. at 55-56.  Congress understood that one of the dominant purposes of Section 13(q) was to protect investors of companies exposed to unique risks.  *See supra* at 4.

Echoing Congress's findings, investors commented during the rulemaking process that Cardin-Lugar disclosures were material and equivalent to other disclosures required under Exchange Act Section 13.  *See supra* at 8 & n.6. Similarly, the Commission concluded that "[t]o the extent that the required disclosures will help investors in pricing the securities of issuers subject to the requirement mandated by Section 13(q), the rules could improve informational efficiency."  77 FR 56,398-99.

Indeed, Congress placed Cardin-Lugar in Section 13 of the Exchange Act, which authorizes the Commission to promulgate "such rules and regulations as the Commission may prescribe as necessary or appropriate for the proper protection of

investors."  15 U.S.C. § 78m(a).  Thus, just like other reporting rules promulgated

under Section 13 – for example, 17 CFR § 229.101(c)(1)(x) ("Competitive

conditions in the business"); and § 229.101(d)(3) ("Risks attendant to foreign

operations"); § 229.1201 ("Disclosure by Registrants Engaged in Oil and Gas

Producing Activities") – Cardin-Lugar requires publicly traded resource extraction

companies to disclose discrete factual information about their operations.  Neither

the content nor the purpose of this disclosure distinguishes it in any

constitutionally significant way from other public company disclosures.[20]

Even if investor protection had not been an overriding Congressional or

Commission concern, the ordinary rule that factual disclosures do not violate the

First Amendment would still preclude Petitioners' challenge.  *See* SEC Br. at 54-

56; *see also Wall Street Publishing*, 851 F.2d at 374; *Planned Parenthood v. Casey*,

505 U.S. 833, 884 (1992) (plurality opinion) (rejecting claim that law compelling

physicians to provide women seeking an abortion certain factual information

violated physicians' First Amendment rights, because medical practice is subject to

reasonable regulation); *id.* at 967-69 (Rehnquist, J., concurring in part and

---

[20] Petitioners suggest that this disclosure requirement differs from others because it does not concern "speech relating to the purchase and sale of securities."  API Br. at 32 n.7.  They are wrong.  The Exchange Act operates on the premise that stock prices reflect publicly available information.  *See Basic Inc. v. Levinson*, 485 U.S. 224, 245-46 (1988). Thus, by making available information about Petitioners' operations, the disclosure at issue affects the pricing of stocks, Final Rule, 77 FR 56,398-99, intrinsically impacting the decision to *purchase* or *sell* securities.

dissenting in part) (upholding provision under rational basis review without even mentioning the First Amendment).

D.      *Cardin-Lugar easily survives the level of scrutiny appropriate for securities regulation*

This Circuit has recognized that the government's "broad powers to regulate the securities industry" forms "a distinct category of communications in which the government's power to regulate is *at least as broad* as with respect to the general rubric of commercial speech." *Wall Street Publishing*, 851 F.2d at 373-74 (emphasis provided). Indeed, the Supreme Court has affirmed the government's broad power to regulate the economy, even through compelled speech. *See Glickman v. Wileman Bros. & Elliott, Inc.*, 521 U.S. 457, 468, 477 (1997) (refusing to apply *Central Hudson* to compelled funding of advertising, explaining that "what we are reviewing is a species of economic regulation that should enjoy the same presumption of validity that we accord to other policy judgments made by Congress.").

Consistent with this strong presumption of validity, this Circuit held in *Wall Street Publishing* that the first line of *Central Hudson* inquiry – "whether the asserted governmental interest is substantial" – has no application to securities regulation. 851 F.2d at 373. Thus, when Petitioners argue that the disclosure requirement must promote a "compelling government interest," they propose a constitutional test at odds with controlling precedent.

28

E.       *The disclosure implicate no core First Amendment concerns*

The disclosure requirement bears none of the hallmarks that trigger strict scrutiny.  First, it does not force anyone to communicate or endorse any message – political, ideological, symbolic, or otherwise.  API complains that Cardin-Lugar requires them to speak on a "controversial" matter. API Br. at 1.  But it only requires them to disclose discrete payment information, not to embrace any state-sponsored viewpoint.  Unlike in *Wooley v. Maynard*, 430 U.S. 705 (1977), Cardin-Lugar would not force anyone to become a "mobile billboard" for the government's "ideological point of view[.]"  Unlike in *R.J. Reynolds Tobacco Co. v. FDA*, 696 F.3d 1205 (D.C. Cir. 2012), neither the statute nor the Rule compels nonfactual speech that might be misinterpreted.  It is irrelevant that Petitioners perceive a connection between payment disclosures and some ongoing debate about the governments receiving these payments.  Advertising "link[ing] a product to a current public debate is not thereby entitled to the constitutional protection afforded noncommercial speech."  *Spirit Airlines, Inc. v. U.S.*, 687 F.3d 403, 412 (D.C. Cir. 2012).

Second, the disclosure requirement does not restrain Petitioners from communicating any message to any audience.  *Cf. Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N.Y.*, 447 U.S. 557 (1980); *Riley v. National Fed. of the Blind of North Carolina, Inc.*, 487 U.S. 781 (1988).  Issuers may say

29

anything they like about their government payments.  But they do not have a

constitutional right to conceal these payments.

Regardless, the disclosure requirement surmounts even "strict scrutiny."[21]

Protecting investors is a compelling government interest in furtherance of an

"essential operation": regulating the securities market.  *See, e.g., Blount v. SEC,* 61

F.3d 938, 944 (D.C.Cir. 1995).  Moreover, promoting accountability and

transparency is a compelling interest of U.S. foreign policy.  SEC Br. at 60-63; *see*

*also* Sarah N. Lynch & Timothy Gardner, *U.S. State Dept backs rule on foreign*

*payments for firms*, REUTERS (Jan. 10, 2012), *at*

www.reuters.com/article/2013/01/10/us-state-dept-sec-idUSBRE90914H20130110.

It is also an important domestic policy, as it promises to "benefit Americans at

home" by improving the environments in which resource extraction countries

operate.  *See*, 156 Cong. Rec. S3815-3816 (May 17, 2010) (Sen. Lugar). Thus

Cardin-Lugar passes constitutional muster, regardless of the level of scrutiny.

---

[21] API's argument implies that regulations requiring information to be conveyed to the public must – and can almost never – withstand strict scrutiny, and that there is a preexisting, narrowly circumscribed list of the interests that can be considered compelling.  API Br. at 33-34.  This would upend thousands of run-of-the-mill disclosure laws, such as product labeling provisions, *see Pharmaceutical Care Management Ass'n.*, 429 F.3d at 316, or environmental discharge reports.  *Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 116 (2d Cir. 2001) (First Amendment challenge to mercury reporting requirements "would expose these long-established programs to searching scrutiny by unelected courts. Such a result is neither wise nor constitutionally required.").

## VII.   Even if the Commission erred, remand without vacatur would be the proper remedy.

If the Court finds the Commission's justifications insufficient in any respect, it should remand without vacatur.  That is the appropriate remedy where "an agency may be able readily to cure a defect in its explanation of a decision." *Heartland Regional Med. Ctr. v. Sebelius*, 566 F.3d 193, 198 (D.C. Cir. 2009); *Milk Train, Inc. v. Veneman*, 310 F.3d 747, 755-56 (D.C. Cir. 2002).

Moreover, API asserts that it will take considerable time for issuers to comply with Cardin-Lugar, JA__210.  The Commission required disclosures beginning for fiscal years ending after September 2013.  77 FR 56,365/2.  Vacatur would make this impossible, but remand would allow the Commission to correct any errors while keeping issuers on track to begin reporting in 2014.  The Court should therefore remand if necessary because vacatur would cause "disruptive consequences" to the regulatory scheme.  *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993).

## CONCLUSION

For the foregoing reasons, the Court should deny the Petition.

Dated:        January 16, 2013                    Respectfully submitted,

                                                  /s/ Jonathan G. Kaufman
                                                  Jonathan G. Kaufman
                                                  Marco Simons
                                                  EARTHRIGHTS INTERNATIONAL
                                                  1612 K St. NW Suite 401

Washington, DC 20006
Phone: 202 466-5188 x113
Fax: 202-466-5189
jonathan@earthrights.org

/s/ Howard M. Crystal
Howard M. Crystal
MEYER GLITZENSTEIN &
CRYSTAL
1601 Conn. Ave., N.W. Suite 700
Washington, DC 20009-1056
Phone: 202-588-5206
Fax: 202-588-5049
hcrystal@meyerglitz.com

*Counsel for Oxfam America, Inc.*

*Of Counsel:*

Richard Herz
rick@earthrights.org
EARTHRIGHTS INTERNATIONAL
1612 K St. NW Suite 401
Washington, DC 20006
Phone: 202-466-5188
Fax: 202-466-5189

Richard J. Rosenzweig
rrosenzweig@goulstonstorrs.com
Derek B. Domian
ddomian@goulstonstorrs.com
GOULSTON & STORRS, P.C.
400 Atlantic Avenue
Boston, MA 02110-3333
Phone: 617-482-1776
Fax: (617)-574-4112

**CERTIFICATE OF COMPLIANCE WITH TYPE VOLUME LIMITATION**

I certify that this brief complies with the type volume limitation set forth in the Court's December 21, 2012, order.  The brief contains 6,995 words.  I also certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Office Word in 14-Point Times New Roman.

**CERTIFICATE OF SERVICE**

I hereby certify that on January 16, 2013, I caused the foregoing brief to be filed upon the Court through the use of the D.C. Circuit CM/ECF electronic filing system.  I further certify that I caused to be hand delivered 8 copies of the foregoing brief to the Clerks' Office.

All participants in the case are registered CM/ECF users and will be served by the appellate CM/ECF system.


Dated: January 16, 2013                      */s/ Jonathan G. Kaufman*
                                             JONATHAN G. KAUFMAN

**CERTIFICATE OF SERVICE**

I hereby certify that on this 17th day of May, 2013, I caused the foregoing Opposition to Plaintiffs' Motion for Summary Judgment and Cross-Motion for Summary Judgment by Intervenor-Defendant Oxfam America, Inc., and supporting materials, to be filed with the Clerk of Court for the United States District Court for the District of Columbia using the Court's CM/ECF system.  All parties will be served via CM/ECF.


Dated: May 17, 2013                           */s/ Howard M. Crystal*
                                              Howard M. Crystal