## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN PETROLEUM INSTITUTE, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> SECURITIES AND EXCHANGE COMMISSION, <br><br> Defendant. | Case 1:12-cv-01668-JDB |

## BRIEF FOR REPRESENTATIVES
## EDWARD J. MARKEY, MAXINE WATERS, ELIOT L. ENGEL,
## JIM McDERMOTT, GREGORY W. MEEKS, BETTY McCOLLUM,
## JIM MORAN, EARL BLUMENAUER, ANDRÉ CARSON,
## SAM FARR, PETER WELCH, AND BARBARA J. LEE
## AS *AMICI CURIAE* SUPPORTING DEFENDANT

In accordance with this Court's Scheduling Order dated May 3, 2013, Representatives Edward J. Markey, Maxine Waters, Eliot L. Engel, Jim McDermott, Gregory W. Meeks, Betty McCollum, Jim Moran, Earl Blumenauer, André Carson, Sam Farr, Peter Welch, and Barbara J. Lee hereby submit the following brief supporting the Securities and Exchange Commission in the above-captioned matter. The brief is a reproduction of the *amici curiae* brief filed by several members of the House of Representatives in the United States Court of Appeals for the D.C. Circuit on January 16, 2013 (D.C. Cir. No. 12-1308, Doc. No. 1415530).

DATED: May 17, 2013

Respectfully submitted,

  /s/ Jeffrey W. Mikoni

Justin B. Slaughter
Investigative Counsel
House Natural Resources Committee
Democratic Staff
186 Ford House Office Building
Washington, DC 20515
Tel: (202) 225-6065

Jeffrey W. Mikoni
(D.C. Bar. No. 501892)
   *Counsel of Record*
CLEARSPIRE LAW CO., PLLC
1747 Pennsylvania Ave., NW
Suite 200
Washington, DC 20006
Tel: (202) 595-2045
j.mikoni@clearspire.com

*Counsel for Amici Curiae*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rules 28(a)(1) and 29(d), the undersigned counsel certifies as follows:

## A.  Parties And Amici.

All parties and intervenors appearing before the Commission and this Court are listed in Petitioners' brief.  To counsel's knowledge, all *amici* appearing in this Court are listed in Respondent's brief, with the exceptions of Sen. Carl Levin (who noticed his intent to participate after Respondent filed its brief) and the complete list of signatories to this brief: Rep. Edward J. Markey, Rep. Maxine Waters, Rep. Eliot L. Engel, Rep. Jim McDermott, Rep. Gregory W. Meeks, Rep. Betty McCollum, Rep. Jim Moran, Rep. Earl Blumenauer, Rep. André Carson, Rep. Sam Farr, Rep. Peter Welch, and Rep. Barbara J. Lee.

## B.  Rulings Under Review.

The rule challenged by Petitioners was adopted by the Commission in Disclosure of Payments by Resource Extraction Issuers, Securities Exchange Act Release 34-67717, which was published in the Federal Register at 77 FR 56,365 (Sept. 12, 2012).

## C.  Related Cases.

The other related case of which counsel is aware is listed in Respondent's brief.

**D.  Grounds For Filing Separately.**

This Court authorized *amici* to file a separate brief in support of Respondent

through its Order of January 11, 2013.

DATED: January 16, 2013                  /s/ Jeffrey W. Mikoni
                                         Jeffrey W. Mikoni
                                             *Counsel of Record*
                                         CLEARSPIRE LAW CO., PLLC
                                         1747 Pennsylvania Ave., NW
                                         Suite 200
                                         Washington, DC 20006
                                         Tel: (202) 595-2045
                                         j.mikoni@clearspire.com

                                         *Counsel for Amici Curiae*

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ..............i

TABLE OF AUTHORITIES .....................................................................iv

GLOSSARY AND ABBREVIATION CONVENTIONS ........................................vi

INTRODUCTION AND STATEMENT OF INTEREST........................................1

SUMMARY OF ARGUMENT ...............................................................3

ARGUMENT ...................................................................................4

I.   The Commission's Promulgation Of The Resource Extraction Rule
     Did Not Violate The Administrative Procedure Act ........................................4

     A.   Petitioners Are Incorrect That The Commission Was Required
          To Take Additional Steps During Promulgation Of The
          Resource Extraction Rule ....................................................5

     B.   Legislative History From The House Confirms That Congress
          Left The Commission No Relevant Discretion Regarding The
          Resource Extraction Rule ....................................................8

II.  The Resource Extraction Rule's Disclosure Requirements Are In Line
     With Previous Reforms Made To The Exchange Act ...................................12

     A.   The Exchange Act Has Been The Birthplace Of Several
          Payment Disclosure Requirements .....................................13

     B.   Public, Company-Specific Disclosure Of Payments Is
          Necessary To Protect And Empower Investors ..................16

CONCLUSION.................................................................................17

CERTIFICATE OF COMPLIANCE......................................................18

CERTIFICATE OF SERVICE .............................................................19

# TABLE OF AUTHORITIES

## CASES

*Am. Bus Ass'n v. Rogoff*, 649 F.3d 734 (D.C. Cir. 2011) ..........................................4

*Cal. Human Dev. Corp. v. Brock*, 762 F.2d 1044 (D.C. Cir. 1985) .........................4

*\*Morton v. Mancari*, 417 U.S. 535 (1974) ...............................................................6

*Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55 (2004) ....................................4

## STATUTES AND BILLS

*15 U.S.C. § 78m(q) ..................................... 1, 3, 4, 6, 7, 8, 9, 10, 11, 12, 14, 15, 16

H.R. 3, 100th Cong. (1988) ......................................................................................14

H.R. 4353, 105th Cong. (1998) .................................................................................14

*H.R. 6066, 110th Cong. (2008) .................................................................1, 9, 10, 11

Pub. L. No. 108-199 (2004) ......................................................................................15

## OTHER AUTHORITIES

144 Cong. Rec. H10306 (daily ed. Oct. 9, 1998) (statement of Rep. Markey), *available at* http://www.gpo.gov/fdsys/pkg/CREC-1998-10-09/pdf/ CREC-1998-10-09-pt1-PgH10302-2.pdf#page=5 ........................................15

Letter to Chairman Schapiro from 58 Members of Congress (June 22, 2012), *available at* http://democrats.naturalresources.house.gov/sites/demo crats.naturalresources.house.gov/files/documents/2012-06-22_SEC_ ChairmanSchapiro_ProtectPowerless.pdf ........................................................7

Letter to the U.S. Securities and Exchange Commission from Rep. Barney Frank *et al.* (Feb. 15, 2012), *available at* http://sec.gov/comments/s7-42-10/s74210-162.pdf.......................................................................................9

Opening Statement by Rep. Maxine Waters, Hearing on "The State of the
    International Financial System, Including International Regulatory
    Issues Relevant to the Implementation of the Dodd-Frank Act," House
    Financial Services Committee (Sept. 22, 2010), *available at*
    http://financialservices.house.gov/media/file/opening%20statements/
    rep_%20waters.pdf ........................................................................................11

Press Release of the House Natural Resources Committee, "Obama
    Administration's Coal Mining Regulation will be Over-budget,
    Overdue, and Cost Thousands of Jobs and Energy Security" (Mar. 6
    2012),      *available     at*      http://naturalresources.house.gov/news/
    documentsingle.aspx?DocumentID=283529................................................10

Report of the Securities and Exchange Commission on Questionable and
    Illegal Corporate Payments and Practices (May 1976), *available at*
    https://www.sec.gov/spotlight/fcpa/sec-report-questionable-illegal-
    corporate-payments-practices-1976.pdf ......................................................13

Report on the Unlawful Corporation Payments Act of 1977, No. 95-640
    (Sept. 28, 1977), *available at* http://www.justice.gov/criminal/fraud/
    fcpa/history/1977/houseprt-95-640.pdf ......................................................14

## GLOSSARY AND ABBREVIATION CONVENTIONS

| | |
|---|---|
| APA | Administrative Procedure Act, 5 U.S.C. § 500 *et seq.* |
| API | American Petroleum Institute |
| API Br. at __ | Citation to Brief for Petitioners |
| Commission | Securities and Exchange Commission |
| Dodd-Frank | Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 |
| Exchange Act | Securities and Exchange Act of 1934, 15 U.S.C. § 78a *et seq.* |
| FCPA | Foreign Corrupt Practices Act of 1977, 15 U.S.C. § 78dd-1 *et seq.* |
| Petitioners | Petitioners American Petroleum Institute, Chamber of Commerce of the United States of America, Independent Petroleum Association of America, and National Foreign Trade Council |
| Resource Extraction Rule | Disclosure of Payments by Resource Extraction Issuers Rule, 17 C.F.R. Parts 240 and 249 |
| Respondent | Respondent Securities and Exchange Commission |
| SEC Br. at __ | Citation to Brief for Respondent |
| Section 1504 | Section 1504 of Dodd-Frank, codified at 15 U.S.C. § 78m(q) |

## INTRODUCTION AND STATEMENT OF INTEREST

This court has before it a key rule mandated by the Dodd-Frank Wall Street Reform Act ("Dodd-Frank"): the Disclosure of Payments by Resource Extraction Issuers Rule ("Resource Extraction Rule"), 17 C.F.R. Parts 240 and 249.  Section 1504 of Dodd-Frank, codified at 15 U.S.C. § 78m(q), laid out precise prescripts that the Securities and Exchange Commission ("Commission") was required to follow when promulgating a rule requiring companies that make payments to governments in connection with the extraction of oil, natural gas, or other minerals to disclose those payments to the Commission and the public.[1]

*Amici* are current members of the House of Representatives, all of whom helped pass Dodd-Frank in the House and are strong supporters of this rule; one *amicus*, Rep. Waters, was a member of the conference committee on Dodd-Frank and also co-sponsored H.R. 6066, a precursor bill, during the 110th Congress. Although Section 1504's plain text provides a clear mandate to the Commission, we are filing this brief because we can provide clarity about the original congressional intent behind Section 1504, including our intended scope for rules promulgated thereunder.  This information confirms that the Commission acted

---

[1] The SEC refers to Section 1504 as Section 13(q) and the Final Rule as Rule 13q.

appropriately and within the boundaries of federal law in promulgating the Resource Extraction Rule.[2]

---

[2] *Amici* certify that no party's counsel authored this brief, in whole or part, and no one, other than the *amici* listed herein or their counsel, contributed money intended to fund the preparation or submission of this brief.

## SUMMARY OF ARGUMENT

1.  Dodd-Frank explicitly mandated the Commission to release the Resource Extraction Rule.  By laying out precise and specific commands dictating the rule's scope and nature, Congress left the Commission no relevant discretion to utilize when promulgating the rule.  The Commission was therefore not required to make any additional findings regarding the benefits or costs of the rule, because Congress already did so when enacting Dodd-Frank.  A review of the plain language of Section 1504, along with the history surrounding its adoption, confirms that the Commission acted appropriately.

2.  The Resource Extraction Rule's disclosure requirements are in line with previous reforms made to the Exchange Act of 1934 ("Exchange Act") requiring the disclosure of certain foreign actions.  A requirement that companies disclose all payments made to the U.S. and foreign governments in connection with resource extraction projects ensures that potential investors will have access to, among other things, material information about the commercial, political, and legal risks companies may face.

## ARGUMENT

### I. The Commission's Promulgation Of The Resource Extraction Rule Did Not Violate The Administrative Procedure Act.

Petitioners contend that the Commission acted arbitrarily and capriciously in adopting the Resource Extraction Rule. *See* API Br. at 3–4. But "[a]n agency does not act arbitrarily or unlawfully when it follows the mandate of Congress." *Am. Bus Ass'n v. Rogoff*, 649 F.3d 734, 741 (D.C. Cir. 2011). When an agency follows an explicit congressional dictate, that action cannot be arbitrary and capricious, even if the action would otherwise appear unreasonable. *See Cal. Human Dev. Corp. v. Brock*, 762 F.2d 1044, 1051 (D.C. Cir. 1985). Rather, failure to follow such an express mandate would be arbitrary. *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 64–65 (2004). Therefore, where an agency is following a direct mandate from Congress, that agency cannot run afoul of the Administrative Procedure Act.

Here, the Commission was following such an explicit, detailed congressional mandate; Section 1504 laid out the precise contours that the Resource Extraction Rule must have, and the Commission followed those dictates to the letter. *See* SEC Br. at 39–53. Relevant legislative history from the House further indicates that Congress drafted the heart of the rule for the Commission, leaving only the implementation of the rule and the selection of a few details to the Commission.

**A.    Petitioners Are Incorrect That The Commission Was Required To Take Additional Steps During Promulgation Of The Resource Extraction Rule.**

Many of Petitioners' arguments erroneously contend that the Commission failed to take certain steps that Section 1504 somehow implicitly required. Specifically, Petitioners assert that the Commission was statutorily required to determine the rule's economic benefits, API Br. at 37, to permit the confidential submission of company-specific data, API Br. at 47, to grant exemptions to the disclosure requirements, API Br. at 53, and to define the term "project," API Br. at 59.

The express text of the statute defeats Petitioners' arguments.  When we in Congress want the Commission to conduct additional analysis or consider certain alternatives in a mandatory rulemaking, we make that intention known.  Contrary to the Petitioners' claims, we did not require that the Commission define "project," nor did we require that the Commission grant any exemptions.  SEC Br. at 39–54. Rather, the Commission might well have acted arbitrarily and in violation of both Section 1504 and the Administrative Procedure Act if it had *granted* Petitioners' exemptions to key parts of the rule, parts which we required the Commission to include.[3]    We likewise support the Commission's flexibility regarding the

---

[3] Petitioners acknowledge that the Commission's "exemptive authority" is plenary and may only be used at the Commission's choosing.  API Br. at 53.  The

definition of "project"—this flexibility is, indeed, in line with one Petitioner's own submissions. *See* SEC Br. at 52.

We also strongly disagree with Petitioners' argument that the Commission was required to determine the rule's economic benefits. The statutes that Petitioners claim require such an inquiry only apply where Congress asks the Commission to consider the "public interest." *See* SEC Br. at 30. Here, the fact that Section 1504 required the Commission to release the rule must be interpreted as a congressional mandate that the public interest would be served by the rule's adoption—we in Congress are not in the habit of passing laws that are *against* the public interest. Thus understood, these various statutory provisions exist in harmony. *See, e.g.*, *Morton v. Mancari*, 417 U.S. 535, 551 (1974) ("[W]hen two statutes are capable of coexistence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective.").

Petitioners also appear to contend that the Commission has an inherent obligation to review the economic benefits of every new rule. *See* API Br. at 37 (citing *Chamber of Commerce v. SEC*, 412 F.3d 133, 144 (D.C. Cir. 2005)). But that standard only applies to rules promulgated via the Commission's plenary power to grant exemptions. *See id.* at 138 n.4. Here, by passing Section 1504, we in Congress informed the Commission that promulgating the Resource Extraction

---

Commission cannot be required to use an optional power, especially to override a Congressional command.

Rule would not impose any unnecessary burden on competition, based on our controlling determination that the rule's myriad benefits outweighed its possible costs.

This is the heart of the matter.  We in Congress did not request that the Commission conduct a more searching inquiry into the economic benefits of the rule or its impact on competition, because we had already done so as part of the lengthy legislative process that gave rise to Section 1504.  *See* Part I.B, *infra*. Congress is critically concerned about the impacts of rulemakings on both economic growth and job growth in America; those two concerns are first among equals in policymaking.  Because of this concern, we took the step of considering the myriad economic benefits that the rule will provide: it will help improve government accountability and reduce instability in key energy-producing countries, thereby reducing energy security risks; it will increase investor information about the commercial, political, and legal risks companies may face; and it will generally increase investor knowledge about those companies. *See, e.g.*, Letter to Chairman Schapiro from 58 Members of Congress (June 22, 2012), *available at* http://democrats.naturalresources.house.gov/sites/democrats.natural resources.house.gov/files/documents/2012-06-22_SEC_ChairmanSchapiro_Protect Powerless.pdf.  Similarly, we concluded that this rule will not significantly dampen competition; given that America's example sets securities-law standards for much

of the world, we anticipate that numerous other countries will follow in our footsteps.[4]

We in Congress take our responsibility to create jobs, promote economic stability, and otherwise pursue public economic benefits with the greatest seriousness.  As the People's elected officials, we did not feel that we should delegate considerations about this rule's benefits to an agency.  Petitioners are therefore wrong to claim that the Commission was required to take certain additional steps that we in Congress never requested.  Rather, by declining to do so, the Commission acted in accord with Congress's detailed command to adopt and release the Resource Extraction Rule.

**B.** **Legislative History From The House Confirms That Congress Left The Commission No Relevant Discretion Regarding The Resource Extraction Rule.**

Petitioners repeatedly misjudge our reasoning for enacting Section 1504, thereby warranting a discussion of pertinent legislative history.  *See* API Br. at 6–8, 38.  History in the House—the evolution of the Resource Extraction Rule from its antecedents in unenacted legislation, through the adoption of Section 1504, and beyond—confirms that we left the Commission minimal discretion regarding the promulgation of the Resource Extraction Rule.

---

[4] For example, the European Union is close to adopting a similar disclosure rule.

Although Section 1504 was not adopted until 2010, statements from a variety of House Members over the last ten years have reiterated the need for a natural resources extraction rule that would both help developing countries and increase information available to investors.  For example, in 2008, House Members held a legislative hearing on H.R. 6066, a bill that would have required disclosure of resource extraction payments.  H.R. 6066 had the same goals as Section 1504, though they were couched in less mandatory language than Congress ultimately adopted in Section 1504.   *Compare* H.R. 6066, 110th Cong. § 3(a) (2008) (requiring the Commission to modify existing disclosure rules) *with* Section 1504(2) (requiring the Commission to issue a new final rule regarding resource extraction disclosure).  Importantly, H.R. 6066 included the requirement that "*each issuer* required [to] file an annual report with the Commission shall disclose *in such report* the total amounts, for each foreign country and for each category of payment for each foreign country, of any and all payments made, directly or indirectly, by *the issuer or any of its subsidiaries*," *see* H.R. 6066, 110th Cong. § 3(a) (2008) (emphasis added)—a fact that conferees of Dodd-Frank and co-sponsors of H.R. 6066 reiterated to the Commission during the rulemaking process under Section 1504. [5]

---

[5] *See* Letter to the U.S. Securities and Exchange Commission from Rep. Barney Frank *et al.* (Feb. 15, 2012) at 2, *available at*  http://sec.gov/comments/s7-42-10/s74210-162.pdf

In light of this history, it is unsurprising that Section 1504 did not engender any discussion during the House's final floor debate on the Bill. As Petitioners note, Section 1504 did not originate in the House, *see* API Br. at 7, but was added during the Conference Committee between the House and Senate. Notably, six of the House conferees, including Rep. Maxine Waters, co-sponsored H.R. 6066. Given that Section 1504's language was not in the version of Dodd-Frank that had been marked up, debated, and passed by the House of Representatives in 2009, a reasonable observer would expect numerous House Members to remark on the Section during either the Conference Committee or the June debate on final passage if Section 1504 actually granted the Commission broad discretion to shape the rule.[6] But no such guidance was needed here, as Section 1504's mandate reflected the culmination of years of congressional insight into the proper nature and scope of a Resource Extraction Rule. Instead, the House's comparative silence supports the conclusion that Section 1504 constituted a straightforward,

---

[6] Members of Congress typically offer such comments if agencies will be conducting rulemakings over which they have broad discretion. *See, e.g.*, Press Release of the House Natural Resources Committee, "Obama Administration's Coal Mining Regulation will be Over-budget, Overdue, and Cost Thousands of Jobs and Energy Security" (Mar. 6 2012), *available at* http://naturalresources.house.gov/news/documentsingle.aspx?DocumentID=283529 (urging the revision of a rule to prevent mountaintop removal mining, even though the rule had yet to be drafted).

uncontroversial command to the Commission to release a rule in accord with its dictates.[7]

Comments following the bill's passage reinforce the fact that the Commission had no discretion with respect to the "choices" challenged by Petitioners.  For example, Rep. Maxine Waters described Section 1504 thusly:

> I would like to take this time to focus on a little known but very important provision of the Dodd-Frank Act: *the extractive industries transparency requirement*.  This provision requires all companies registered with the [Commission] to disclose, in their filings, what they pay to foreign governments for extracting oil, natural gas, and minerals.  The data must be disclosed on a country-by-country basis so that payments to individual countries can be tracked in a transparent manner.  This provision was based on the bipartisan Cardin-Lugar Amendment, which was proposed in the Senate, and it is similar to the Extractive Industries Transparency Disclosure Act (H.R. 6066 in the 110th Congress), which was introduced by Chairman Frank and which I cosponsored.

Opening Statement by Rep. Maxine Waters, Hearing on "The State of the International Financial System, Including International Regulatory Issues Relevant to the Implementation of the Dodd-Frank Act," House Financial Services Committee (Sept. 22, 2010), *available at* http://financialservices.house.gov/media/file/opening%20statements/rep_%20waters.pdf.   Rep. Waters's statement again characterizes Section 1504 as a mandate.  Her statement does not discuss what factors the Commission should consider in adopting the rule or even mention the

---

[7] This forbearance from U.S. Representatives also belies Petitioners' frequent claims that this rule is "one of the most expensive rules in the history of the [SEC]." API Br. at 1.

Commission.  Instead, her statement speaks only of the many things Section 1504 "requires," providing additional evidence that Congress dictated the Resource Extraction Rule's ultimate scope.

## II.   The Resource Extraction Rule's Disclosure Requirements Are In Line With Previous Reforms Made To The Exchange Act.

Petitioners suggest that the rule is an "unusual statutory requirement," API Br. at 35, one that has unclear "benefits and effects on efficiency, competition, and capital formation," API Br. at 40.  Petitioners even imply that the Members of the Commission who voted for the rule view it with skepticism and doubt whether it "will necessarily generate measurable, direct economic benefits to investors or issuers."  API Br. at 19.  The overwhelming subtext to Petitioners' brief is that the Exchange Act may not even give the Commission authority to release the Rule.

Nothing could be further from the truth.  While Section 1504 seeks to end the "Resource Curse"—the situation in which resource-rich developing countries' efforts to extract resources corrupt the political system and enrich a select few— Section 1504 offers numerous advantages to domestic investors.  The Resource Extraction Rule fits into the broader history of disclosure requirements birthed from the Exchange Act, and the two share a core aim: ensuring investors have material and other information about the commercial, political, and legal risks companies may face related to their investments.

**A.    The Exchange Act Has Been The Birthplace Of Several Payment Disclosure Requirements.**

The concept of requiring disclosures of foreign activities is well established. For example, in the early 1970s, the Commission's Enforcement Division made efforts to prosecute corporations for failing to disclose to investors certain "slush funds" which were being used for "questionable or illegal foreign payments." Report of the Securities and Exchange Commission on Questionable and Illegal Corporate Payments and Practices at 3 (May 1976), *available at* https://www.sec.gov/spotlight/fcpa/sec-report-questionable-illegal-corporate-payments-practices-1976.pdf.  Ultimately, the Commission concluded that some of the payments were "material and required to be disclosed" because their existence evidences corporate mismanagement and that such payments could expose a company to "repercussions of an unknown nature." *Id.* at 15.  Notably, this conclusion—that foreign payments, both legitimate and corrupt, represent material and other information for investors and that companies can be prosecuted for not disclosing those payments—was derived from the inherent powers granted to the Commission via the Exchange Act.

The Commission's efforts to require disclosure of illegal payments helped lead to other disclosure regimes for public companies.  In 1977, at the urging of the Commission, we in Congress passed the Foreign Corrupt Practices Act ("FCPA") as an amendment of the Exchange Act.  The rationale for enacting the FCPA was

not dissimilar to our rationale for passing Section 1504: to protect business and investors.

> The payment of bribes to influence the acts or decisions of foreign officials, foreign political parties or candidates for foreign political office is unethical.  It is counter to the moral expectations and values of the American public.  But not only is it unethical, it is bad business as well.  It erodes public confidence in the integrity of the free market system.  It short-circuits the marketplace by directing business to those companies too inefficient to compete in terms of price, quality or service, or too lazy to engage in honest salesmanship, or too intent upon unloading marginal products. . . .

> Bribery of foreign officials by some American companies casts a shadow on all U.S. companies.  The exposure of such activity can damage a company's image, lead to costly lawsuits, cause the cancellation of contracts, and result in the appropriation of valuable assets overseas.

Report on the Unlawful Corporation Payments Act of 1977, No. 95-640 (Sept. 28, 1977), *available at* http://www.justice.gov/criminal/fraud/fcpa/history/1977/houseprt-95-640.pdf.

The FCPA was not the last reform Congress passed to protect investors via disclosure requirements.  In 1988, Congress passed additional reforms to strengthen the FCPA that were introduced by one of this brief's authors, Rep. Edward Markey.  *See* H.R. 3, 100th Cong (1988).  Similarly, in 1998, Congress passed and President Clinton signed H.R. 4353, the International Anti-Bribery and Fair Competition Act of 1998, which "strengthen[ed] U.S. law by extending its coverage to cover foreign persons and corporations, [and to] bribes paid to officials

of international organizations." 144 Cong. Rec. H10306 (daily ed. Oct. 9, 1998) (statement of Rep. Markey), *available at* http://www.gpo.gov/fdsys/pkg/CREC-1998-10-09/pdf/CREC-1998-10-09-pt1-PgH10302-2.pdf#page=5. Furthermore, in 2004, Congress and the President enacted Public Law No. 108-199, which created an Office of Global Security Risk at the Commission to establish a process for the SEC to identify and disclose to investors all companies on U.S. exchanges operating in states designated as sponsors of terror.

Section 1504 reflects Congress's determination that a focus on corrupt corporate payments alone is insufficient to protect investors and to promote U.S. national security; secrecy around legitimate payments also allows those funds to be misappropriated by corrupt foreign government officials and thus presents a risk to investments. In the lucrative oil, gas, and mining sectors in particular, additional disclosures of "legitimate" payments are necessary to protect investors by helping them evaluate the business risks issuers are exposed to in resource-rich and often volatile countries. In addition, increased transparency that supports good governance in resource-rich states directly advances the foreign policy interests of the United States.

Significantly, each of these efforts focused on specific individual payments by companies, including reporting on a company-by-company basis. Section 1504's requirement for similar country-by-country disclosure is consonant with

these earlier reforms.  It is therefore incorrect for Petitioners to suggest that the

Commission lacks the authority to require disclosure of payments in connection

with natural resource extraction projects; the Resource Extraction Rule mandates

such a requirement and is, at heart, a successor to previous rules promulgated by

the Commission.  Section 1504 is merely the latest brick in a road toward greater

disclosure of payments, both legitimate and illegitimate, and related activities—a

road that Congress and the Commission have been building for decades.

**B.    Public, Company-Specific Disclosure Of Payments Is Necessary To Protect And Empower Investors.**

Congress and the Commission have had good reason for devoting so much

time and energy to requiring corporate disclosures: increased disclosure goes to the

very heart of the Commission's mission to protect investors and the markets.

Undisclosed payments are corrosive to free enterprise.  They destroy trust and

transparency.  They obscure valuations and penalize sensible business practices.

Investors and the public need to be able to fully evaluate whether a company has

properly addressed the commercial, political, and legal risks it faces when

operating around the globe in environments where corruption is rife and rule of law

weak.  The Resource Extraction Rule, and the country-by-country and project-by-

project data that will be disclosed under it, are critical to giving investors and the

public the ability to make these evaluations.

It is true that the Resource Extraction Rule will help reduce corruption and aid in the alleviating of the Resource Curse for developing countries.  But it will also shine a light for investors on the true value of a company's oil, gas, and mining projects.  There is information that will be disclosed under the Resource Extraction Rule that is material information for investors; there can be no doubt that the Commission is the proper organization to release and enforce the rule as mandated by Congress.

## CONCLUSION

For all of the foregoing reasons, we urge this Court to rule in favor of the Respondents.


DATED: January 16, 2013               Respectfully submitted,

                                       /s/ Jeffrey W. Mikoni
Justin B. Slaughter                   Jeffrey W. Mikoni
Investigative Counsel                    *Counsel of Record*
House Natural Resources Committee     CLEARSPIRE LAW CO., PLLC
Democratic Staff                      1747 Pennsylvania Ave., NW
186 Ford House Office Building        Suite 200
Washington, DC 20515                  Washington, DC 20006
Tel: (202) 225-6065                   Tel: (202) 595-2045
                                      j.mikoni@clearspire.com

*Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type-volume requirement of Federal Rule of Appellate Procedure 29(d), as modified by this Court's Order of January 11, 2013, because this brief contains 3,487 words, as determined by the word-count function of Microsoft Word 2010, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(ii) and D.C. Circuit Rule 32(a)(1); and

2.     This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in 14-point Times New Roman font.

DATED: January 16, 2013          Respectfully submitted,

                                            /s/ Jeffrey W. Mikoni
                                   Jeffrey W. Mikoni
                                    *Counsel of Record*
                                   CLEARSPIRE LAW CO., PLLC
                                   1747 Pennsylvania Ave., NW
                                   Suite 200
                                   Washington, DC 20006
                                   Tel: (202) 595-2045
                                   j.mikoni@clearspire.com

                                   *Counsel for Amici Curiae*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 17, 2013, I electronically filed the foregoing Brief For Representatives Edward J. Markey, Maxine Waters, Eliot L. Engel, Jim McDermott, Gregory W. Meeks, Betty McCollum, Jim Moran, Earl Blumenauer, André Carson, Sam Farr, Peter Welch And Barbara J. Lee As *Amici Curiae* Supporting Defendant with the Clerk of the Court by electronic mail to the following address: dcd_cmecf@dcd.uscourts.gov.

 /s/ Jeffrey W. Mikoni  
Jeffrey W. Mikoni  
(D.C. Bar. No. 501892)  
CLEARSPIRE LAW CO., PLLC  
1747 Pennsylvania Ave., NW  
Suite 200  
Washington, DC 20006  
Tel: (202) 595-2045  
j.mikoni@clearspire.com