**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **AMERICAN PETROLEUM INSTITUTE, et al.,**<br><br>    **Plaintiffs,**<br><br>        v.<br><br>**SECURITIES AND EXCHANGE COMMISSION,**<br><br>    **Defendant,**<br><br>**and**<br><br>**OXFAM AMERICA, INC**.<br><br>    **Intervenor-Defendant.** | **Civil Action No.  12-1668 (JDB)** |

<u>**MEMORANDUM OPINION**</u>

Acting pursuant to a provision of the Dodd-Frank Wall Street Reform and Consumer Protection Act, § 1504, Pub. L. No. 111-203, 124 Stat. 1376, 2220 (2010), the Securities and Exchange Commission promulgated a Rule requiring certain companies to disclose payments made to foreign governments in connection with the commercial development of oil, natural gas, or minerals. Plaintiffs—associations of oil, natural gas, and mining companies whose members are subject to the Rule—raise a host of challenges to the Rule and contest both the Rule and the underlying statute on First Amendment grounds. After a sojourn to the D.C. Circuit, which held that jurisdiction over plaintiffs' challenge lay in this Court, the parties have filed cross-motions for summary judgment. For the reasons set forth below, the Court will grant plaintiffs' motion, vacate the Rule, and remand to the Commission for further proceedings.

<u>**BACKGROUND**</u>

The Dodd-Frank Act adds section 13(q), codified at 15 U.S.C. § 78m(q), to the Securities Exchange Act of 1934. Section 13(q) addresses a phenomenon known as the "resource curse," whereby "oil, gas reserves, and minerals . . . can be a bane, not a blessing, for poor countries, leading to corruption, wasteful spending, military adventurism, and instability" when "oil money intended for a nation's poor ends up lining the pockets of the rich or is squandered on showcase projects instead of productive investments." 156 Cong. Rec. S3816 (May 17, 2010) (statement of Sen. Lugar); see also Am. Petroleum Inst. v. SEC, 714 F.3d 1329, 1331 (D.C. Cir. 2013). As a result, many of the world's "most wealthy mineral countries are the poorest countries" in terms of their citizens' quality of life. 156 Cong. Rec. S5872 (July 15, 2010) (statement of Sen. Cardin).

Before section 13(q) was enacted, key players in extractive industries developed the Extractive Industries Transparency Initiative ("EITI") to help address this concern through increased transparency. A voluntary international initiative, the EITI provides information about payments that extractive industry companies make to governments. See Joint Appendix [Docket Entry 30] at 30 (May 10, 2013) ("J.A."). Under the EITI, each country works with civil and industry groups to establish a protocol for reporting payments. Companies and host governments submit payment information confidentially to an independent reconciler who compiles the information and publishes a publicly accessible report, which can have varying levels of specificity. See id. at 60-62; see also SEC Br. [Docket Entry 31] at 8-9 (May 10, 2013). The EITI seeks to achieve greater transparency, while "respect[ing] . . . existing contracts and laws" and "balanc[ing] the presumption of disclosure . . . with the concern of companies regarding commercial confidentiality." J.A. 62.

Unsatisfied with the EITI regime alone, Congress passed section 13(q), which directs the Commission to "issue final rules that require each resource extraction issuer"—a company listed on a U.S. stock exchange that "engages in the commercial development of oil, natural gas, or minerals," 15 U.S.C. § 78m(q)(1)(D)—"to include in an annual report of the resource extraction issuer information relating to any payment made . . . to a foreign government or the [U.S.] Government for the purpose of the commercial development of oil, natural gas, or minerals." 15 U.S.C. § 78m(q)(2)(A). In this report, the issuers must disclose the type and total amount of payments made for each project and to each government. Id. The information must "be submitted in an interactive data format," which includes "electronic tags" identifying certain information such as the total amount of payments, the currency used, and the project to which the payments relate. 15 U.S.C. § 78m(q)(2)(C), (D). In a separate subsection entitled "Public availability of information," section 13(q) directs that, "[t]o the extent practicable, the Commission shall make available online, to the public, a compilation of the information required to be submitted [in the annual report]."[1] 15 U.S.C. § 78m(q)(3). And in a subsection called "International transparency efforts," section 13(q) specifies that "[t]o the extent practicable," the Commission's rules requiring payment disclosure "shall support the commitment of the Federal Government to international transparency promotion efforts relating to the commercial development of oil, natural gas, or minerals." 15 U.S.C. § 78m(q)(2)(E).

---

[1] In full, the "[p]ublic availability" subsection provides:
    Public availability of information
    (A) In general
        To the extent practicable, the Commission shall make available online, to the public, a compilation of the information required to be submitted under the rules issued under paragraph (2)(A).
    (B) Other information
        Nothing in this paragraph shall require the Commission to make available online information other than the information required to be submitted under the rules issued under paragraph (2)(A).
15 U.S.C. § 78m(q)(3).

In light of these requirements, the Commission has now promulgated a final rule. See Disclosure of Payments by Resource Extraction Issuers, 77 Fed. Reg. 56365 (Sept. 12, 2012) ("Rule"). The Rule spells out information that issuers must provide in the annual reports, and directs that the disclosures be made via a new form, "Form SD," rather than in an existing Exchange Act annual report. See id. at 56390; see also id. at 56417. During the rulemaking, some commentators had argued that the annual reports should be filed confidentially with the Commission, and the Commission should make public only a compilation of the disclosed information. Rejecting those arguments because it was not persuaded "that the statute allows" confidential disclosure, id. at 56391, the Commission required public filing of the annual reports via its online "EDGAR" system. Id. at 56418. See generally U.S. Sec. & Exch. Comm'n, Important Information About EDGAR, http://www.sec.gov/edgar/aboutedgar.htm (last visited June 21, 2013). In the Adopting Release, the Commission explained that it "ha[s] not yet determined the content, form, or frequency of any . . . compilation" that would be available online, but noted "that users of the information will be able to compile the information in a manner that is most useful to them by using the electronically-tagged data filed by resource extraction issuers" in the annual reports themselves. 77 Fed. Reg. at 56394.

Before adopting the final Rule, the Commission conducted a cost-benefit analysis, both as to costs it ascribed to "the statutory mandate" and as to those stemming from the Commission's "exercise of discretion." See id. at 56398. It calculated that "the total initial cost of compliance for all issuers is approximately $1 billion and the ongoing cost of compliance is between $200 million and $400 million." Id. The Commission also found that "the rules will impose a burden on competition, but [the Commission] believe[s] that any such burden that may result is necessary in furtherance of the purposes of Exchange Act Section 13(q)." Id.

Several commentators asked the Commission to exercise its exemptive authority to waive disclosure requirements for four countries—Angola, Cameroon, China, and Qatar—which prohibit disclosure of payment information. Id. at 56370. These commentators argued that, absent an exemption, they may be forced to withdraw from those countries, losing tens of billions of dollars. Id. at 56402. Assuming (without conclusively determining) that the listed countries prohibit payment disclosure, the Commission analyzed the likely impact on three of the fifty-one issuers operating there, finding that "commentators' concerns that the impact of such host country laws could add billions of dollars of costs to affected issuers, and hence have a significant impact on their profitability and competitive position, appear warranted." Id. at 56412. The Commission declined to adopt an exemption for foreign law prohibitions, however, explaining "that adopting such an exemption would be inconsistent with the structure and language of Section 13(q)," and that it "could undermine the statute by encouraging countries to adopt laws, or interpret existing laws, specifically prohibiting the disclosure required under the final rules." Id. at 56372-73.

Plaintiffs filed a complaint in this Court "[o]ut of an abundance of caution" and simultaneously filed a petition for review in the D.C. Circuit, the court that both the plaintiffs and the Commission believed held original jurisdiction. See Am. Petroleum Inst., 714 F.3d at 1330 (internal quotation marks omitted). Pursuant to the parties' request, this Court stayed all proceedings in the case until the D.C. Circuit issued its final order. See December 5, 2012, Order. Disagreeing with both plaintiffs and the Commission (and agreeing with intervenor Oxfam America, Inc.), on April 26, 2013, the D.C. Circuit held that original jurisdiction lies in the district court, dismissing the petition for review "without prejudice to petitioners' suit in the district court." Am. Petroleum Inst., 714 F.3d at 1337.

To accelerate the proceedings, plaintiffs and the Commission requested that their motions for summary judgment be decided based on the D.C. Circuit briefs. The Court granted the request, lifting the stay and allowing the parties to file their D.C. Circuit briefs and Joint Appendix. The Court also permitted Oxfam to intervene as a defendant, and to make a brief supplemental filing. Several amici filed briefs in support of the Commission. After the parties submitted their cross-motions for summary judgment, the Court held a motions hearing on June 7, 2013.

## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), summary judgment is appropriate when the pleadings and the evidence demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). This standard governs plaintiffs' First Amendment challenge.

In a case involving review of a final agency action under the Administrative Procedure Act, 5 U.S.C. § 706, by contrast, the standard set forth in Rule 56(a) does not apply because of a court's limited role in reviewing the administrative record. See Loma Linda Univ. Med. Ctr. v. Sebelius, 684 F. Supp. 2d 42, 52 (D.D.C. 2010), aff'd, 408 F. App'x 383 (D.C. Cir.); see also Am. Bioscience, Inc. v. Thompson, 269 F.3d 1077, 1083 (D.C. Cir. 2001) ("[W]hen a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal. The entire case on review is a question of law." (footnote and internal quotation marks omitted)). Under the APA, a court must "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), in excess of statutory authority, 5 U.S.C. § 706(2)(C), or "without observance of procedure required by law," 5 U.S.C. § 706(2)(D).

Summary judgment thus serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review. See Richard v. INS, 554 F.2d 1173, 1177 & n.28 (D.C. Cir. 1977); see also Fla. Power & Light Co. v. Lorion, 470 U.S. 729, 743-44 (1985) ("The task of the reviewing court is to apply the appropriate APA standard of review, 5 U.S.C. § 706, to the agency decision based on the record the agency presents to the reviewing court.").

## ANALYSIS

Plaintiffs argue that section 13(q) and the Rule compel speech in violation of the First Amendment. They also present various APA challenges, arguing that the Commission erroneously read the statute as requiring public disclosure of the reports, that it was arbitrary and capricious in declining to grant an exemption for countries that prohibit disclosure, that the Commission's cost-benefit analysis was flawed, that it was required to solicit additional comments before relying on a particular set of data, and that it arbitrarily declined to define the word "project." The Court will not reach plaintiffs' First Amendment challenge or most of their APA arguments because two substantial errors require vacatur: the Commission misread the statute to mandate public disclosure of the reports, and its decision to deny any exemption was, given the limited explanation provided, arbitrary and capricious.

### I.       Statutory Ambiguity As to Scope of Public Disclosure

In subsection (2)(A), section 13(q) provides:

(2) Disclosure

(A) Information required

Not later than 270 days after July 21, 2010, the Commission shall issue final rules that require each resource extraction issuer to include in an annual report of the resource extraction issuer information relating to any payment made by the resource extraction issuer, a subsidiary of the resource extraction issuer, or an entity under the control of the resource extraction issuer to a foreign government

> or the Federal Government for the purpose of the commercial development of oil, natural gas, or minerals, including—
>
>> (i) the type and total amount of such payments made for each project of the resource extraction issuer relating to the commercial development of oil, natural gas, or minerals; and
>> (ii) the type and total amount of such payments made to each government.

15 U.S.C. § 78m(q)(2). Subsection (3)(A) then directs:

> (3) Public availability of information
>
>> (A) In general
>>
>>> To the extent practicable, the Commission shall make available online, to the public, a compilation of the information required to be submitted under the rules issued under paragraph (2)(A).

15 U.S.C. § 78m(q)(3).

In the Rule, the Commission did not decide on the form that a compilation would take. But it read the annual report provision, subsection (2)(A), as requiring public disclosure of the annual reports.[2] During the rulemaking, some commentators suggested that payment information should be submitted confidentially to the Commission, with the Commission "mak[ing] public only a compilation of [the] information." 77 Fed. Reg. at 56401. These commentators "argued [that] such an approach would address many of their concerns regarding disclosure of commercially sensitive or legally prohibited information and would significantly mitigate the costs of the mandatory disclosure under Section 13(q)." Id. The Commission rejected the suggestion, however, because it viewed itself as bound to require public filing of the annual reports. "[W]e have not taken this approach in the final rules," the Commission explained, "because we believe Section 13(q) requires resource extraction issuers to provide the payment disclosure publicly and does not contemplate confidential submissions of the required information." Id. (emphasis added); see also id. (rejecting "suggest[ion] that the statutory

---

[2] Interpreting section 13(q)'s "an annual report" language, the Commission has required that issuers provide the payment information on a specially-created form, rather than as part of an existing annual report. The Court will refer to these forms as the annual reports.

language of Section 13(q) gives the Commission discretion to hold individual company data in confidence and to use that data to prepare a public report consisting of aggregated payment information by country").

In assessing the Rule's validity as a matter of statutory interpretation, the Court applies Chevron's well-worn framework. See Chevron USA Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-43 (1984). The Court first asks "whether Congress has directly spoken to the precise question at issue," in which case it "must give effect to the unambiguously expressed intent of Congress." Id. at 842-43. If the "statute is silent or ambiguous with respect to the specific issue," the Court moves to the second step and must defer to the agency's interpretation as long as it is "based on a permissible construction of the statute." Id. at 843. But "deference is only appropriate when the agency has exercised its own judgment." Transitional Hosps. Corp. v. Shalala, 222 F.3d 1019, 1024 (D.C. Cir. 2000) (internal quotation marks omitted). "When, instead, the agency's decision is based on an erroneous view of the law, its decision cannot stand." Id. (internal quotation marks omitted).

There is no dispute that the Commission viewed itself as bound to make the annual reports themselves publicly available. See Oral Arg. Tr. at 31:10-18 [Docket Entry 47] (June 7, 2013) ("THE COURT: You agree that the SEC viewed itself as being bound by the statute. [SEC COUNSEL]: That is correct, Your Honor[.]"); SEC Br. at 39-40 ("The Commission properly determined"—"at Chevron step one"—that "Section 13(q) requires the public disclosure of the issuers' payment information."); see also, e.g., 77 Fed. Reg. at 56391 (explaining Commission's view that it lacks discretion to allow confidential submission of the information). Here, then, the Commission "itself has stopped at step one," believing "that it is without discretion to reach another result." Arizona v. Thompson, 281 F.3d 248, 254 (D.C. Cir. 2002). Accordingly, no

deference to its interpretation is warranted. See id. ("Deference to an agency's statutory interpretation is only appropriate when the agency has exercised its own judgment, not when it believes that [the] interpretation is compelled by Congress." (internal quotation marks omitted)). The Court must, then, determine whether public disclosure of the full payment information is compelled by the statute, that is, in Chevron terms, "whether Congress has directly spoken to the precise question at issue." 467 U.S. at 842. If not, the Commission's decision "cannot stand." Shalala, 222 F.3d at 1024 (internal quotation marks omitted).

In assessing the statute, the Court will first examine section 13(q) for itself. Then, the Court will turn to the Commission's arguments based on subsection (2)(A) (the "annual report" provision), and the Commission's additional arguments that rely on its interpretation of the word "compilation" in subsection (3)(A). Finally, the Court will consider Oxfam's arguments in favor of the public disclosure requirement.

### a. Public Disclosure of Annual Reports Requirement

The Commission contends that Congress unambiguously required "public disclosure of the issuers' annual reports." See SEC Br. at 41. "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." Robinson v. Shell Oil Co., 519 U.S. 337, 341 (1997). Hence, the Court will begin with the language of the annual report provision, see Barnhart v. Sigmon Coal Co., 534 U.S. 438, 450 (2002) ("As in all statutory construction cases, we begin with the language of the statute."), before moving to the provision's context in section 13(q), and then ending with the Exchange Act as a whole.

Under the heading "Disclosure," and the subheading "Information required," section 13(q) provides that "the Commission shall issue final rules that require each resource extraction

issuer to include in an annual report of the resource extraction issuer information relating to any payment made" to a government for "the commercial development of oil, natural gas, or minerals." 15 U.S.C. § 78m(q)(2)(A). The statute's plain language poses an immediate problem for the Commission, for it says nothing about <u>public</u> filing of these reports. To state the obvious, the word "public" appears nowhere in this provision. The statute speaks of "disclosure" and "an annual report," not "public disclosure" and not a "publicly filed annual report."

Nor does the phrase "annual report" command public filing. The dictionary definition of "report"—"[a]n account presented usually in detail," <u>American Heritage Dictionary</u> 1049 (1985)—harbors no public availability requirement. <u>See also</u> 13 <u>Oxford English Dictionary</u> 650 (2d ed. 1989) ("An account brought by one person to another, esp. of some matter specially investigated."). Neither does the term's ordinary meaning include public disclosure or access; a report, a document that an employee gives an employer or a student gives an instructor, readily encompasses non-public documents. <u>See, e.g.</u>, <u>Gardner v. Florida</u>, 430 U.S. 349, 354 (1977) (considering constitutionality of a certain use "of a confidential presentence report"); <u>Ass'n for Women in Sci. v. Califano</u>, 566 F.2d 339, 346 (D.C. Cir. 1977) (discussing Freedom of Information Act privilege for "confidential reports"). Given the annual report provision's silence as to public disclosure—either by referring to it specifically or by using other words that necessarily entail public availability—the Commission's argument that the statute unambiguously requires public filing is a climb up a very steep hill. <u>Cf.</u> <u>Arizona</u>, 281 F.3d at 257 ("There is nothing in the phrase 'authorized to use' that dictates that it be read as 'authorized to use under a state plan,' rather than 'authorized to use under a state cost allocation plan.'" (emphasis omitted)).

Moving to the annual report requirement in the context of section 13(q), things get even worse for the Commission. After establishing the basic disclosure requirement in subsection (2)(A), section 13(q) expressly addresses "[p]ublic availability of information" in subsection (3)(A). <u>See</u> 15 U.S.C. § 78m(q)(3). The separate discussion eliminates any inference that Congress relied on (2)(A), the disclosure provision, to establish the information's public availability. Rather, it shows that "[w]here Congress wanted to provide for" public availability, "it did so explicitly." <u>See</u> <u>Barnhart</u>, 534 U.S. at 452; <u>see also</u> <u>Russello v. United States</u>, 464 U.S. 16, 23 (1983) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (alteration and internal quotation marks omitted)). Viewing section 13(q) as a whole, then, shows that subsection (2)(A), consistent with its title, governs "[i]nformation required" to be "[d]isclos[ed]," while subsection (3)(A) governs that information's "[p]ublic availability." 15 U.S.C. § 78m(q)(2), (3).

More instructive still, the public availability requirement is narrower than the underlying disclosure. Section 13(q)(3) provides: "To the extent practicable, the Commission shall make available online, to the public, a compilation of the information required to be submitted under the rules issued under [the annual report provision,] paragraph (2)(A)." 15 U.S.C. § 78m(q)(3)(A). The public availability, then, is limited to "a compilation of the information," and is required only "[t]o the extent practicable." A natural reading of this provision is that, if disclosing some of the information publicly would compromise commercially sensitive information and impose high costs on shareholders and investors, then the Commission may selectively omit that information from the public compilation. The Commission points to nothing prohibiting that reading.

12

By contrast, the Commission's proposed reading of subsection (2)(A)—that the annual reports must, under all circumstances, themselves be publicly accessible—makes for a peculiar framework. If it is not practicable to make a compilation available, it is likely impracticable to make all the information available through full disclosure of the annual reports themselves. Conversely, once the full reports were public, there would be little to make compilation of them online impracticable. So the Commission's approach reads the "[t]o the extent practicable" limit out of (3)(A), or at least confines it to relatively trivial costs, such as the Commission's modest time investment to create the compilation. These difficulties make it even less probable that the Commission's proposed reading is the only one possible. Cf. Tarrant Reg'l Water Dist. v. Herrmann, No. 11-889, slip op. at 14 (U.S. June 13, 2013) ("At the very least, the problems that arise from [the] proposed reading suggest that [the statute's] silence is ambiguous . . . .").

Viewing the Exchange Act as a whole further crystallizes that "report," as used throughout the Act, contains no unstated (yet clear) public filing requirement. The Exchange Act expressly addresses the content and form of "[r]eports by [an] issuer of security" without saying anything about public access. See 15 U.S.C. § 78m(a), (b). Furthermore, other provisions of the Act use "report" to refer to documents filed with the Commission alone. Section 13(f), for instance, governs reports by institutional investment managers. It provides for a two-step framework. First, every manager fitting a certain description "shall file reports with the Commission." 15 U.S.C. § 78m(f)(1). "Promptly after the filing of any such report, the Commission shall make the information contained therein conveniently available to the public," unless an exception applies. See 15 U.S.C. § 78m(f)(4); see also Full Value Advisors, LLC v. SEC, 633 F.3d 1101, 1106-07 (D.C. Cir. 2011) (upholding mandatory disclosure to the Commission, but declining to rule on the constitutionality of public disclosure because

petitioner's information may never be made public). To be sure, as the Commission argues, this provision errs on the side of public disclosure, establishing "limited exceptions to the public disclosure requirement." <u>See</u> SEC Post-Arg. Letter [Docket Entry 45] at 1 (June 10, 2013). But insofar as it requires public disclosure of certain information, section 13(f)(1) does so expressly, rather than resting on the word "report." Moreover, this provision flatly contradicts any argument that "report," as used in the Exchange Act, unambiguously means a public filing—section 13(f) refers to a filing <u>made to the Commission alone</u> as a "report." Only "<u>after</u> the filing of any such report" does the Commission have to make certain information publicly available, and portions may never be publicly disclosed. 15 U.S.C. § 78m(f)(4) (emphasis added); <u>id.</u> ("Notwithstanding the preceding sentence, any such information identifying the securities held by the account of a natural person or an estate or trust . . . shall not be disclosed to the public."). Ergo, a "report" cannot be something inexorably filed on EDGAR or otherwise open to public view.

To summarize: Section 13(q) requires in subsection (2)(A) disclosure of annual reports but says nothing about whether the disclosure must be public or may be made to the Commission alone. Neither the dictionary definition nor the ordinary meaning of "report" contains a public disclosure requirement. And section 13(q) expressly addresses public availability of information in the following subsection, (3)(A), establishing a different and more limited requirement for what must be publicly available than for what must be annually reported. Topping things off, the Exchange Act as a whole uses the word "report" to refer to disclosures made to the Commission alone. If this is Congress's way of unambiguously dictating that reports must be publicly filed, it is a peculiar one indeed.

### b.  Commission's Arguments Based on Annual Report Provision

Faced with these powerful indicia that Congress left the public availability of reports unspecified, the Commission offers no persuasive arguments that the statute unambiguously requires public disclosure of the full reports. It argues first that "there is . . . a strong presumption that Congress intended for the disclosed information to be made public" because "[t]he Exchange Act is fundamentally a public disclosure statute." SEC Br. at 40. This argument founders on three points. First, as the Commission itself acknowledges, section 13(q), with its global political concern, differs significantly from a typical provision of the Exchange Act that seeks to protect investors through public disclosure. Compare Tcherepnin v. Knight, 389 U.S. 332, 336 (1967) ("One of [the Exchange Act's] central purposes is to protect investors through the requirement of full disclosure by issuers of securities[.]"), with 77 Fed. Reg. at 56397 ("This type of social benefit differs from the investor protection benefits that our rules typically strive to achieve.").[3] Second, any "presumption" about Congress's intent for the reports' dissemination— if such an atextual presumption can ever create statutory clarity—falls away when, as here, the statutory provision expressly addresses public availability. See Lockheed Corp. v. Spink, 517 U.S. 882, 897 (1996) ("When Congress includes a provision that specifically addresses [an aspect] of a statute, that provision trumps any general inferences that might be drawn from the substantive provisions of the statute."); see also Rodriguez v. United States, 480 U.S. 522, 525 (1987) (describing as "most impermissibl[e]" reliance on an "understanding of the broad purposes of the [statute]" in statutory interpretation). Third, as discussed above, other provisions of the Exchange Act use "report" to mean a filing made to the Commission alone, so the Act does not always presume public disclosure. But see SEC Br. at 40 ("the reports that public companies are required to submit under the [Exchange] Act . . . have always been made public").

---

[3] Indeed, the Commission found that public filing of the full information would burden investors, see 77 Fed. Reg. at 56401-03, so non-public disclosure may actually do more here to further the Act's investor protection purpose.

At the motions hearing, the Commission took another tack, arguing that the Exchange Act reports are made public pursuant to "consistent agency action," and that Congress legislated against this known background when using the word "report." Oral Arg. Tr. at 59:17. True, the majority of section 13 reports are (pursuant to the Commission's regulations) publicly filed. But this practice is not without exception. Section 13(f), discussed above, contemplates filings to the Commission alone, and indeed bars some information from public disclosure. And the Commission's regulations provide for confidential treatment of certain information. See 17 C.F.R. § 240.24b-2(a) ("Any person filing any . . . report . . . pursuant to the [Exchange] Act may make written objection to the public disclosure of any information contained therein in accordance with the procedure set forth below."). Given these nuances, Congress would have had no basis to rely on universal public treatment of Exchange Act reports. And Congress appears to have done no such thing, instead addressing public availability specifically on a number of occasions throughout the Exchange Act rather than relying on an unstated understanding about public access for all reports. See, e.g., 15 U.S.C. §§ 75m(f), 75m(l), 75m(m), 75m(p).[4]

Finally, the Commission's reliance at the motions hearing on Young v. Community Nutrition Institute, 476 U.S. 974 (1986), is misplaced. Young—a Chevron step two case interpreting an ambiguous statute—stands for the unremarkable proposition that, where Congress revises a statute, its "failure to revise or repeal the agency's interpretation is persuasive evidence that the interpretation is the one intended by Congress." Young, 476 U.S. at 983 (internal quotation marks omitted). But here, section 13(q) is a new provision that the Commission has not previously interpreted and that Congress has not revisited, so there is no analogous agency

---

[4] With respect to 15 U.S.C. § 75m(p), the Commission argues that the public availability provision serves as a "supplemental mechanism[] for making the disclosures publicly accessible." SEC Br. at 42 n.18. The Commission offers no support for this proposition, which is at odds with the statutory text and structure.

interpretation for Congress to adopt. All that is left of the Commission's argument is that public filing of reports "is how we usually do it." Even if true, however, that does not establish a clear statutory mandate to do so here.

### c. Commission's Arguments Based on "Compilation"

The Commission did not indicate in the Rule the form that a compilation would take, opting instead to assure public availability by requiring public filing of the annual reports themselves. Nonetheless, the Commission's briefs confirm that it misinterprets the word "compilation." And its remaining arguments for mandatory public disclosure of the annual reports rest, implicitly or expressly, on this error.

In a footnote, the Commission contends that "compilation of information" in subsection (3)(A) unambiguously means "pulling together in one place the actual issuer-by-issuer project-level and government-level information," with each report "retaining its independent character." SEC Br. at 43 n.19. This rigid definition again improperly cabins the Commission's discretion. To be sure, some compilations, like those of judicial opinions or Shakespeare's sonnets, pull together the items compiled without editing them, and some compilations contain every item (e.g., each Shakespearean sonnet) in existence. But that is hardly the only meaning of "compilation." As the Supreme Court explained in defining the word in the Freedom of Information Act context, "[a] compilation, in its ordinary meaning, is something composed of materials collected and assembled from various sources or other documents." John Doe Agency v. John Doe Corp., 493 U.S. 146, 153 (1989) (citing dictionaries). Definitions of "compilation" indicate a combination of elements, but do not require that all the elements be included or that they be included in unedited form. See American Heritage Dictionary 301 ("compilation" is "[s]omething compiled, as a set of data, a report, or an anthology," and "compile" means "[t]o

put together or compose from materials gathered from several sources"); <u>see also</u> 3 <u>Oxford English Dictionary</u> 605 (listing, as a usage example for "compilation," the sentence, "The sketch of history . . . was little more than a brief compilation from foreign memoirs.").

Ordinary usage confirms what dictionary definitions reveal—that "compilation" can encompass both selection and editing of materials. Examples abound in judicial opinions. The Supreme Court has used "compilation" to mean an aggregation of data that removes some detail to prevent identification (akin to the reduced specificity commentators sought here). <u>See</u> <u>Church of Scientology of Cal. v. IRS</u>, 484 U.S. 9, 16 (1987) ("'Thus the Internal Revenue Service can continue to release for research purposes . . . compilations of data, such as the tax model, which do not identify individual taxpayers.'" (quoting Congressional Record)). The Supreme Court has held that a non-verbatim summary of records is a compilation prepared for a law enforcement purpose under the Freedom of Information Act. <u>See</u> <u>FBI v. Abramson</u>, 456 U.S. 615, 624-25, 632 (1982). And it has generally made clear that a compilation can be edited. <u>See</u> <u>Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.</u>, 515 U.S. 557, 570 (1995) ("For that matter, the presentation of an edited compilation of speech generated by other persons is a staple of most newspapers' opinion pages[.]"). Elsewhere in the <u>United States Code</u>, Congress has defined "compilation" to capture editing and selection. <u>See</u> 17 U.S.C. § 101 ("A 'compilation' is a work formed by the collection and assembling of preexisting materials or of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship."). And the Commission itself—in this very rulemaking—uses "compile" to mean creating a less-than-comprehensive collection of information. <u>See</u> 77 Fed. Reg. at 56391 ("[The information's] interactive data format will enable users of the information to <u>extract</u> the information that is of the most interest to them and to <u>compile</u> and compare it in any manner they

find useful." (emphasis added)); see also id. at 56401 (rejecting commentators' suggestion that "the Commission make public only a compilation of information").

Moreover, the "[t]o the extent practicable" language in subsection (3)(A), the provision requiring a compilation, indicates that compilations of different specificity (and hence of varying practicability) are permitted. If a compilation could take only one form, the more natural formulation would be a binary one—such as *if practicable*—which is conducive to a yes or no response. Similarly, rather than a compilation of the annual reports, subsection (3)(A) requires "a compilation of the information" in the reports, weakening any inference that the reports themselves, unedited and retaining their independent character, must be pulled together. A compilation of something non-discrete, like information, data, or facts, normally entails substantial selection. See Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 348 (1991) ("Factual compilations, on the other hand, may possess the requisite originality. The compilation author typically chooses which facts to include, in what order to place them, and how to arrange the collected data so that they may be used effectively by readers.").

With this background, the Court can make short work of the Commission's remaining arguments. The Commission contends that allowing non-public disclosure of the issuers' annual reports would lead to "an absurd result," defeating section 13(q)'s transparency purpose if the Commission determines that publishing a compilation is not practicable. SEC Br. at 41-42. But this argument hinges on the erroneous reading of "compilation" as an all-or-nothing document that aggregates the individual reports without alteration and so is likely to be impracticable in its entirety. Because "compilation" can include a subset of the information, excising as

impracticable particular details harmful to competition, subsection (3)(A) fits harmoniously with non-public annual reports.[5]

Similarly, the Commission argues that there is nothing for it to do with the information except provide it to the public, so a rule that requires broader disclosure to the Commission than to the public would be nonsensical. Not so. The Commission does have a "significant responsibility," SEC Br. at 43, with respect to the information—to evaluate it to determine the extent to which disclosing it (in a compilation) would be "practicable," and then use it to make such a compilation.

The Commission's "interactive data format" argument, made in the Rule's release, fares no better. The Commission reasoned that the interactive data format requirement for the reports "suggests that Congress intended for the information to be available for public analysis." 77 Fed. Reg. at 56391. But interactive data serves other purposes: not only will it assist the Commission as it makes the statutorily required compilation, but, as the Commission previously acknowledged, interactive data generally aids its work. See Interactive Data to Improve Financial Reporting, 74 Fed. Reg. 6776, 6793 (Feb. 10, 2009) (explaining that "[t]he availability of interactive data to the staff may also enhance [the Commission's] review of company filings"); see also 77 Fed. Reg. at 56391 ("Requiring resource extraction issuers to provide the payment information in interactive data format will enable users of the information to extract the information that is of the most interest to them and to compile and compare it in any manner they find useful." (emphasis added)).

Finally, the Commission points to subsection (3)(B), which, following (3)(A)'s requirement that the Commission make a compilation of the information publicly available

---

[5] To be sure, a Rule that provides for no or extremely limited public disclosure in the compilation might be an unreasonable interpretation of section 13(q) under Chevron step two analysis. But that possibility sheds little light on section 13(q)'s unambiguous mandate under Chevron step one.

online, provides that "[n]othing in this paragraph shall require the Commission to make available online information other than the information required to be submitted under the rules issued under [the annual report provision,] paragraph (2)(A)." 15 U.S.C. § 78m(q)(3)(B). The Commission contends that this language means that the information in the annual reports "serves as the minimum information that the Commission <u>must</u> include in any public compilation." SEC Br. at 42. That, however, inverts the language, confusing a ceiling with a floor. Section (3)(B) sets out the <u>maximum</u> information that must be included online—the information contained in the annual reports—and directs that "[n]othing . . . shall require" online availability of information "other than" that in the reports. It says nothing at all about information that must at a "minimum" be disclosed.[6]

### d.  Oxfam's Arguments for Full Public Disclosure

Intervenor Oxfam's arguments are similarly unpersuasive. It contends that "Congress signaled its intent for public disclosure by inserting" the provision into "Section 13 of the Exchange Act, which creates the public reporting regime for listed companies." Oxfam Br. [Docket Entry 37] at 22 (May 17, 2013); <u>see also</u> Oxfam Supplemental Br. [Docket Entry 39] at 4 (May 17, 2013). But as discussed earlier, the Exchange Act never defines a "report" as something publicly filed, and leaves room for confidential treatment of reports filed under the Act. Moreover, the placement of the payment disclosure provision, in the face of statutory silence and contrary evidence in the text itself (e.g., subsection (3)(A)), can hardly create clarity.

Oxfam's contention that the "proponents" of section 13(q) "expressed" the intent for public disclosure "throughout the legislative and administrative process" improperly rests on post-enactment comments by individual legislators. <u>See</u> Oxfam Br. at 22-23. "Post-enactment

---

[6] The Commission also argues that the information should be disclosed on an issuer-by-issuer basis to realize section 13(q)'s additional purpose of informing investors. This is an argument about a compilation's requisite specificity if the full reports are not themselves disclosed. The Court has no occasion to address it at this time.

legislative history (a contradiction in terms) is not a legitimate tool of statutory interpretation." Bruesewitz v. Wyeth LLC, 131 S. Ct. 1068, 1081 (2011); see also Jones v. United States, 526 U.S. 227, 238 (1999); 2A Norman J. Singer & J.D. Shambie Singer, Sutherland on Statutory Construction § 48:20 (7th ed. 2012) ("Post-enactment views of those involved with the legislation should not be considered when interpreting the statute.").

It is unsurprising, then, that Oxfam promptly shifts gears, arguing that "even if the Court were to conclude that [section 13(q)] does not mandate public reporting, [the Commission] did not err" because its decision was reasonable. See Oxfam Br. at 23. But it is black letter law that "an agency regulation must be declared invalid, even though the agency might be able to adopt the regulation in the exercise of its discretion, if it was not based on the agency's own judgment but rather on the unjustified assumption that it was Congress' judgment that such a regulation is desirable or required." Arizona, 281 F.3d at 259 (alterations and internal quotation marks omitted). The Rule is invalid here for precisely that reason.

## II.     Commission's Rejection of Any Exemption Where Disclosure Is Prohibited

The Commission made another serious error that independently invalidates the Rule. The denial of any exemption for countries that prohibit payment disclosure was arbitrary and capricious.[7]

Commentators expressed concern about potential losses of many billions of dollars in four countries—Angola, Cameroon, China, and Qatar—which prohibit disclosure of payment information. Assuming, without determining, that these countries prohibit disclosure, the Commission estimated costs and concluded that "commentators' concerns that the impact of

---

[7] The exemption question is ripe for consideration. Although the Commission is also authorized to make exemptions at a later time "upon application," 15 U.S.C. § 78*l*(h), a rule requiring disclosure without providing exemptions immediately affects parties contracting in the shadow of its requirements. See Oral Arg. Tr. at 6:5-9. Moreover, the Commission's reasoning forecloses most arguments these issuers would have for exemptions by individual application.

such host country laws could add billions of dollars of costs to affected issuers, and hence have a significant impact on their profitability and competitive position, appear warranted." 77 Fed. Reg. at 56412; see also id. at 56413 ("Overall, the results of our analysis concur with commentators that the presence of host country laws that prohibit the type of disclosure required under the final rules could be very costly."). The Commission declined to adopt an exemption for countries prohibiting disclosure, however, explaining that while it "understand[s]" the concerns, "adopting such an exemption would be inconsistent with the structure and language of Section 13(q)" and it "could undermine the statute by encouraging countries to adopt laws, or interpret existing laws, specifically prohibiting the disclosure required under the final rules." Id. at 56372-73. The Commission elaborated that, although it "considered . . . providing certain exemptions," doing so

> would be inconsistent with Section 13(q) and would undermine Congress' intent to promote international transparency efforts. To faithfully effectuate Congressional intent, we do not believe it would be appropriate to adopt provisions that would frustrate, or otherwise be inconsistent with, such intent.

Id. at 56413. It therefore concluded that "the competitive burdens" arising from the disclosure requirement "are necessary by the terms of, and in furtherance of the purposes of, Section 13(q)." Id.

Congress has endowed the Commission with authority to make exemptions from certain Exchange Act provisions, including section 13(q) (which is codified in section 78m of title 15). See 15 U.S.C. § 78*l*(h) ("The Commission may by rules and regulations, or upon application of an interested person, . . . exempt in whole or in part any issuer or class of issuers . . . from section 78m, 78n, or 78o(d) of this title . . . upon such terms and conditions and for such period as it deems necessary or appropriate, if the Commission finds . . . that such action is not inconsistent with the public interest or the protection of investors."). While the exemption authority is itself

discretionary, see id. ("may . . . exempt"), exercising it could, in some circumstances, be required

by the Commission's competing statutory obligations, such as the requirement that the

Commission "shall not adopt any . . . rule or regulation which would impose a burden on

competition not necessary or appropriate in furtherance of the purposes of this chapter." See 15

U.S.C. § 78w(a)(2). Aside from any statutory duty to act, moreover, an agency decision as to

exemptions must, like other decisions, be the product of reasoned decisionmaking.

The Commission's primary reason for rejecting an exemption does not hold water. The

Commission argues that an exemption would be "inconsistent" with the "structure and language

of Section 13(q)." 77 Fed. Reg. at 56372; see also id. ("[T]he transparency objectives of Section

13(q) are best served by requiring disclosure from all resource extraction issuers."). But this

argument ignores the meaning of "exemption," which, by definition, is an exclusion or relief

from an obligation, and hence will be inconsistent with the statutory requirement on which it

operates. Nor does it help to argue that section 13(q)'s transparency objectives "are best served"

by permitting no exemptions. Id. As the Supreme Court has recognized,

> no legislation pursues its purposes at all costs. Deciding what competing values will or
> will not be sacrificed to the achievement of a particular objective is the very essence of
> legislative choice—and it frustrates rather than effectuates legislative intent simplistically
> to assume that whatever furthers the statute's primary objective must be the law.

Rodriguez, 480 U.S. at 525-26. Allowing the aims of specific statutes to yield to practicality,

Congress authorized exemptions from certain provisions' requirements; section 13(q), codified

as 15 U.S.C. § 78m(q), is on that list. See 15 U.S.C. § 78l(h). That an exemption is inconsistent

with a statutory provision or that the provision's purpose is "best" served by allowing no

exemptions is hence no answer at all.

Applied more specifically, moreover, the Commission's argument is simply incorrect. If

the statutory provision itself must evidence some openness to exemption, section 13(q) does just

that. It emphasizes practicability in subsection (3)(A), requiring a compilation only "[t]o the extent practicable." 15 U.S.C. § 78m(q)(3)(A). And it provides that the Commission's rule must "support the commitment of the Federal Government to international transparency promotion efforts" to (and only to) "the extent practicable." 15 U.S.C. § 78m(q)(2)(E). The Commission's view of the statute's purpose—international transparency at all costs, exemptive authority or not—thus contradicts what section 13(q) says on the very question.

That is not to say that section 13(q)'s purpose is irrelevant to the exemption analysis. It may be entirely reasonable for the Commission to conclude that requiring disclosure from a certain issuer or about a certain country goes to the heart of the provision's goal, and that the burden reduction is not worth this loss. But here, the Commission impermissibly rested on the blanket proposition that avoiding all exemptions best furthers section 13(q)'s purpose. It did not consider whether a certain country or certain issuer that represents a high portion of the burden on competition and on investors is sufficiently central to that purpose to make an exemption unwarranted.[8]

The Commission does offer a second explanation, that an exemption "could undermine the statute by encouraging countries to adopt laws, or interpret existing laws, specifically prohibiting the disclosure required under the final rules." 77 Fed. Reg. at 56372-73. But where an agency "has relied on multiple rationales (and has not done so in the alternative), and [a court] conclude[s] that at least one of the rationales is deficient, [the court] will ordinarily vacate the [action] unless [it is] certain that [the agency] would have adopted it even absent the flawed rationale." Nat'l Fuel Gas Supply Corp. v. FERC, 468 F.3d 831, 839 (D.C. Cir. 2006). Here,

---

[8] For instance, it is unlikely that China and Qatar, hardly poor nations, are victims of the resource curse. Vast costs associated with these countries (or even, absent certainty as to their laws, a high probability of vast costs) could then provide reason for an exemption.

there is no basis to find that the Commission would have denied an exemption on this secondary ground alone.

Indeed, doing so might itself be arbitrary. True, a broadly written exemption could eviscerate section 13(q) by allowing any country to avoid disclosure by enacting a disclosure-barring law—returning, in effect, to the EITI voluntary compliance regime section 13(q) sought to augment. But dismissing that horrible does not suffice to support a decision costing many billions of dollars and (in the Commission's own analysis) burdening competition. See 15 U.S.C. § 78w(a)(2) (Commission "shall not adopt any . . . rule or regulation which would impose a burden on competition not necessary or appropriate"). The Commission could have limited the exemption to the four countries cited by the commentators or to all countries that prohibited disclosure as of a certain date, fully addressing this concern. See Chamber of Commerce v. SEC, 412 F.3d 133, 144 (D.C. Cir. 2005) (holding that, in some circumstances, failure to consider a suggested alternative can itself violate the APA). More fundamentally, given the proportion of the burdens on competition and investors associated with this single decision, a fuller analysis was warranted. A general statement about incentive problems with a broad version of the exemption does not satisfy the requirement of reasoned decisionmaking when, by the Commission's own estimates, billions of dollars are on the line. See Bus. Roundtable v. SEC, 647 F.3d 1144, 1148 (D.C. Cir. 2011); see also Oral Arg. Tr. at 51:9-11 (the "economic implications of the rules that [the Commission] promulgates" are "very important to the commissioners").

The Commission undertook no such specific analysis, however, instead focusing heavily on the statute's apparent purpose—a purpose it conceived more broadly than the statutory text, which emphasizes practicability. Averse to sacrificing any of the section 13(q) aims no matter

the cost, the Commission abdicated its statutory responsibility to investors. The Commission's exemption analysis hence was arbitrary and capricious and independently invalidates the Rule.[9]

### III.     Plaintiffs' Remaining Arguments

There is no need at this stage to reach plaintiffs' other APA arguments or their First Amendment challenge to the statute's public disclosure requirement. Because the Court has invalidated the Rule, other APA arguments cannot change the disposition. As for the constitutional challenge to section 13(q) itself, the Commission has yet to interpret section 13(q) in light of its discretionary authority, and the interpretation it adopts could alter the First Amendment analysis. Different analytical approaches may be required for a rule that compels disclosure only to the Commission with compilation deemed impracticable, a rule that provides for confidential disclosure followed by a government-authored compilation, and a rule that requires the companies themselves to publicly post detailed information in a particular format. Compare Full Value Advisors, 633 F.3d at 1110 (upholding, under rational basis review, compelled disclosure to the Commission in part because "[t]here is no public audience [the petitioner] must address"), and Riley v. Nat'l Fed'n of the Blind of N.C., Inc., 487 U.S. 781, 800 (1988) (noting that, "as a general rule, the State may itself publish the detailed financial disclosure forms it requires professional fundraisers to file," and describing that approach as more "narrowly tailored" to the problem of fraud), with Nat'l Ass'n of Mfrs. v. NLRB, No. 12-5068, 2013 WL 1876234, *8 (D.C. Cir. May 7, 2013) (concluding that ordering companies themselves to display certain information on their premises violates "[t]he right against compelled speech" even if that information is non-ideological). Selecting the specific

---

[9] Oxfam argues that there was insufficient evidence that the four countries prohibited disclosure. Although the Commission noted the uncertainty, it did not rely on it, let alone to the exclusion of the two flawed rationales addressed above. This argument, then, cannot save the Rule. See Nat'l Fuel Gas Supply Corp., 468 F.3d at 839; see also Calpine Corp. v. FERC, 702 F.3d 41, 46 (D.C. Cir. 2012) ("it is axiomatic that agency decisions may not be affirmed on grounds not actually relied upon by the agency").

interpretation of the statute to test under the First Amendment would be, at this stage, premature. See Full Value Advisors, 633 F.3d at 1106 ("Prudence . . . restrains courts from hastily intervening into matters that may best be reviewed at another time or in another setting, especially when the uncertain nature of an issue might affect a court's ability to decide intelligently." (internal quotation marks omitted)); see also United States v. Sci. Applications Int'l Corp., 626 F.3d 1257, 1277 (D.C. Cir. 2010) (declining to reach constitutional argument "in keeping with the principle that courts should avoid unnecessarily deciding constitutional questions" (internal quotation marks omitted)).

## IV.    Vacatur Is the Appropriate Remedy

Having found the agency action invalid, the Court must decide the appropriate remedy— vacatur and remand to the agency, or remand alone. The decision whether to vacate depends on "the seriousness of the [rule's] deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed." See Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n, 988 F.2d 146, 150-51 (D.C. Cir. 1993) (internal quotation marks omitted). Here, issuers have not yet been required to make disclosures under the Rule, so no disruption will result from vacatur. See 77 Fed. Reg. at 56365 ("A resource extraction issuer must comply with the new rules and form for fiscal years ending after September 30, 2013."); Am. Equity Inv. Life Ins. Co. v. SEC, 613 F.3d 166, 179 (D.C. Cir. 2010) (finding vacatur appropriate where "[b]y its own terms, [the invalid rule] has not yet gone into effect"). Nor is this an area where chaos may result without federal regulation constantly in effect. See Am. Equity, 613 F.3d at 179 (distinguishing case where "vacatur would leave certain pollutants partially unregulated for eighteen months"). In these circumstances, the more disruptive course would be requiring compliance with an invalid Rule whose substance

might change significantly. Indeed, it would be quite odd for this Court to find the Rule invalid and yet permit the Rule's requirements, with their substantial deficiencies, nonetheless to go into effect for the first time.

And the Rule's "deficiencies," <u>Allied-Signal</u>, 988 F.2d at 150, are grave indeed. On the statutory interpretation front, the Commission fundamentally miscalculated the scope of its discretion at critical junctures, viewing itself as shackled by the words "report" and "compilation," when neither can be read to limit its authority. True, the Court has no occasion, at this stage, to decide whether, if the Commission promulgated the same Rule "as an exercise of its discretion . . . the same interpretation would be sustained." <u>Arizona</u>, 281 F.3d at 260 n.17. But (even aside from the gravity of the error) there is reason to think the Rule the Commission will promulgate on remand may take a substantially different form. The Commission noted throughout the Rule that it will burden competition and harm investors, but viewed itself as powerless to address that harm. <u>See</u> 77 Fed. Reg. at 56398-03 (discussing costs from the "Mandatory Reporting Requirement" and noting that "[o]ur discretionary authority to implement Section 13(q) is limited" and that the burden is "necessary"). When informed that it does have the power, the Commission may well strike a different balance. Similarly, in describing its approach, the Commission stated that it will follow the EITI except when section 13(q) clearly deviates from its framework. <u>See</u> <u>id.</u> at 56403 ("[E]xcept for where the language or approach of Section 13(q) clearly deviates from the EITI, the final rules are consistent with the EITI."). But the statute "clearly" deviates from the EITI less than the Commission assumed, and this, too, indicates that the Commission may materially alter the Rule in light of flexibility it did not know it had. <u>See</u> <u>id.</u> at 56391 ("We note that, in [allowing confidential submission of payment information], the EITI approach is fundamentally different from Section 13(q).").

The Commission made at least one other serious error, denying, based on arbitrary and capricious reasoning, any exemption for foreign law prohibitions, a decision that, by the Commission's own assessment, drastically increased the Rule's burden on competition and cost to investors. And because the Court has not addressed plaintiffs' other challenges, questions remain about other aspects of the Rule. See Cement Kiln Recycling v. EPA, 255 F.3d 855, 872 (D.C. Cir. 2001) (remand without vacatur may be inappropriate where the court does not reach "the bulk" of a party's "potentially meritorious challenges"). Finally, the Commission offers virtually no argument against vacatur, noting only that vacatur is assessed on a case-by-case basis without explaining why it may be inappropriate in this case.

## CONCLUSION

For these reasons, plaintiffs' motion for summary judgment will be granted and defendant's and intervenor's cross-motions for summary judgment will be denied. A separate order vacating the Rule and remanding to the Commission for further proceedings will be issued on this date.

/s/
_____
JOHN D. BATES
United States District Judge

Dated: July 2, 2013